531 So.2d 723 (1988)
STATE DEPARTMENT OF HEALTH & REHABILITATIVE SERVICES, Appellant,
v.
David WHALEY, Individually, and As Guardian of His Son, Michael Whaley, a Minor, Appellee.
No. 85-1818.
District Court of Appeal of Florida, Fourth District.
June 29, 1988.
Rehearings Denied October 26, 1988.
Michael B. Davis of Davis, Critton, Hoy & Diamond, West Palm Beach, for appellant.
Allen E. Rossin of Babbitt, Hazouri & Phillips, P.A., and Richard A. Kupfer of Cone, Wagner, Nugent, Johnson, Roth & Romano, P.A., West Palm Beach, for appellee.
Carole B. Shauffer, San Francisco, Cal., for amicus curiae-Youth Law Center.
*724 PER CURIAM.
Appellant, the Department of Health and Rehabilitative Services (HRS), seeks reversal of a final judgment awarding appellee, Michael Whaley, $100,000 in damages and appellee, David Whaley, $5,575 in damages, sustained as a result of an alleged sexual assault on Michael Whaley by a fellow detainee in a juvenile detention intake facility operated by HRS.
On March 14, 1982, Whaley and two companions were arrested for burglary and taken to the juvenile detention center in West Palm Beach, arriving at approximately 6:00 p.m. The intake counselor on duty at that time, Lloyd McCray, testified that, because the youths were charged with offenses that would be felonies if committed by adults, he had to contact the state attorney's office for authorization for detention. He was finally able to make contact and obtain the authorization at approximately 7:30 p.m. McCray also attempted to contact each of the youths' parents, and such contacts were completed at approximately 8:15 p.m. McCray then notified the appropriate personnel that the youths were ready for admission and orientation into the center. Whaley's two companions were individually processed into the detention center proper, while Whaley remained in a holding cell in the intake area.
Although McCray called Master Control several times to pick up Whaley, Whaley remained in the holding cell alone until approximately 11:00 p.m., when another minor, Glenn Moore, was placed in the cell. Moore had been brought in for failure to appear at a hearing on a burglary charge. At approximately 11:30 p.m., Willie Jones was placed in the cell with Whaley and Moore. Jones was charged with armed robbery. He had been picked up and processed for intake in Belle Glade, but there were no cells available there so he was brought to West Palm Beach. According to the interim placement report accompanying Jones, which was completed by a Belle Glade counselor, Jones had previously been charged with several violent crimes, most of which had been nolle prossed or dismissed. None involved sexual assault. Whaley was a white male, fourteen years of age, 5'4" tall, and weighed 98 pounds. Moore was a black male, fifteen years of age, 6'2" tall, and weighed 160 pounds. Jones was a black male, sixteen years old, 6'2" tall and weighed 195 pounds. During admission to the intake facility, both Jones and Moore were polite, respectful and nonaggressive.
The holding cells in the facility were monitored by microphones and there were television monitors in the hallway, but the intake counselors did not have direct access to the receiving equipment. The doors to the cells were also kept open to assist the counselors in monitoring any sound coming therefrom. At about 12:20 a.m., Officer Mallett, who had replaced McCray, noticed the door on the holding cell where the three detainees were held was nearly closed. He walked over to the door, pushed it open, and saw Whaley on his knees in front of Moore, with Jones standing to the side. Moore had his hands around Whaley's neck and Moore's pants were unzipped. When Mallett pushed the door open, the boys moved apart, and Mallett took Whaley out of the cell to a sitting area, where he inquired if he had been hurt. Shortly thereafter Whaley was processed into the detention dormitory. Mallett reported the event, as described, in writing that morning. He reported that Whaley said Moore and Jones had attempted to force him to perform fellatio on Moore; Jones and Moore said that Whaley had voluntarily offered to do so. Mallett testified that Whaley appeared physically unharmed immediately after the incident except that his face and neck were flushed. An investigation of the incident was made by Robert Reis, an intake counselor, who later reported the matter to Whaley's father.
Several months thereafter Whaley was seen by Dr. Cheshire, a psychiatrist, for complaints of nightmares and fear of blacks in groups. He remained under the care of Dr. Cheshire until the case went to trial. Both Dr. Cheshire and a psychologist testified that Whaley suffered from post-traumatic stress syndrome related to the detention center incident. He also suffered from an adolescent conduct disorder *725 that predated the detention center incident. No medical treatment for any physical injuries was ever sought or received by Whaley.
Appellees brought this suit, contending that HRS was negligent 1) in placing Whaley in a holding cell with Moore and Jones, 2) in allowing him to remain there for an extended period of time, 3) in failing to furnish Whaley with immediate medical and psychiatric care after the assault, and 4) in failing to provide adequate supervision. In defense of these charges HRS contended that, on the evening in question, there was a large influx of youths brought into the intake unit and the center was shorthanded that evening. Furthermore, it was argued that the intake personnel had no reason to believe any such conduct would be engaged in by Jones or Moore, as both were polite and cooperative during intake screening that evening. Finally, governmental immunity from tort liability under these circumstances was asserted. The jury verdict found HRS negligent on the first three grounds, but not negligent on the fourth (supervision).
On appeal, HRS's primary contention is that motions for directed verdict should have been granted in its favor on the issues of 1) cell assignment, since this activity falls within the discretionary function exception to the waiver of sovereign immunity, 2) delay in processing Whaley into the dormitory section of the center, since there was no evidence to establish that a sexual assault would be a foreseeable consequence of the delay, and 3) failure to obtain immediate medical and psychiatric care for Whaley after the incident, since there was no evidence to establish that Whaley suffered any additional damages due to such failure. HRS also contends that the trial court erred in admitting into evidence a 1980 predisposition report on Jones (exhibit 18), in directing a verdict on its affirmative defense that Whaley consented to the act, and in excluding evidence of Whaley's subsequent arrest for a series of burglaries.
The most difficult issue in this case involves the application of the doctrine of sovereign immunity. In Commercial Carrier Corporation v. Indian River County, 371 So.2d 1010 (Fla. 1979), the supreme court reviewed much of the history of sovereign immunity in this state, particularly as it related to municipalities, and explained the impact of the Legislature's enactment of section 768.28, Florida Statutes (1975), which states at subsection (5) that the state, its agencies and subdivisions "shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances," but excluding punitive damages and prejudgment interest. At subsection (1) the statute permits tort actions for damages against the state, its agencies or subdivisions for property loss or injury, personal injury, or death, caused by the negligent or wrongful act or omission of the public entity's employee acting within the scope of his office or employment, "under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant in accordance with the general laws of this state... ."
The Commercial Carrier court refused to accept the argument based on the above provisions that, since private individuals do not perform governmental functions, this statute failed to waive sovereign immunity where governmental function is involved. The court relied on the United States Supreme Court's interpretation of almost identical language in The Federal Tort Claims Act in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Because the statute used the expression "under like circumstances," not "under the same circumstances" the United States Supreme Court in Indian Towing concluded that the statute did not preserve sovereign immunity as to all uniquely governmental functions; and, in the particular circumstances of the case, just as any other good Samaritan, when the government undertakes to warn the public of danger and thereby induces reliance, the government has the same duty of care that a private individual would have when he makes a similar undertaking. The Florida Supreme Court in Commercial Carrier by analogy followed the Indian Towing court to the conclusion that, like the Federal Tort *726 Claims Act, the Florida waiver statute did not merely impose on the state and its agencies that liability which municipal corporations already had.
The next issue taken up in Commercial Carrier was whether the government employees' or officials' actions or omissions complained of involved discretion or judgment such as made their acts exempt from the operation of the waiver statute. The court held there was a discretionary exception even though such was not explicitly mentioned in the statute. It quoted with approval the test for drawing the line between discretionary and other executive and administrative functions set forth in Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440, 445 (1965):
Whatever the suitable characterization or label might be, it would appear that any determination of a line of demarcation between truly discretionary and other executive and administrative processes, so far as susceptibility to potential sovereign tort liability be concerned, would necessitate a posing of at least the following four preliminary questions: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? If these preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. If, however, one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved.
371 So.2d at 1019.
In Trianon Park Condominium Association, Inc. v. City of Hialeah, 468 So.2d 912 (Fla. 1985), the Florida Supreme Court added the following significant principle, which can be controlling in tort actions against a governmental department of agency:
In order to subject the government to tort liability for operational phase activities, there must first be either an underlying common law or statutory duty of care in the absence of sovereign immunity. In addition, although the Evangelical Brethren test works properly in instances where a common law or statutory duty exists, it need not be applied in situations where no common law or statutory duty of care exists for a private person because there clearly is no governmental liability under those circumstances.
Id. at 919. The court then discussed four categories of governmental functions and activities: (I) legislative, permitting, licensing and executive officer functions; (II) enforcement of laws and public safety protection; (III) capital improvements and property control operations, and (IV) provision of professional, educational and general services for the health and welfare of the citizens.
The functions involved in the first category were said to be actions inherent in the act of government, not subject to a common law duty of care, and subject to judicial interference only where a constitutional or statutory provision is violated. Functions in the second category, governmental exercise of its discretionary power to enforce duly enacted laws, were said to be a matter of governance for which there has never been a common law duty of care. The court cautioned, however, that "[t]he lack of a common law duty for exercising a discretionary police power function must, however, be distinguished from existing common law duties of care applicable to the *727 same officials or employees in the operation of motor vehicles or the handling of firearms during the course of their employment to enforce compliance with the law." Id. at 920. As to these, there has always been a common law duty of care, said the court, and now, because of the waiver of sovereign immunity statute, governmental entities may be held liable for violations of these duties of care. Id.
As to the third category, a governmental entity cannot be liable for exercising its discretion and omitting to build, expand or modernize capital improvements such as buildings and roads. However, once the governmental entity takes control of property or an improvement, the entity has the same common law duty as a private person properly to maintain and operate the property. Id. at 920-21.
The last category  provision of professional, educational and general services for the welfare of citizens  the court held to be distinguishable from the discretionary power to enforce compliance with laws passed under the police power of the state. "These service activities, such as medical and educational services, are performed by private persons as well as governmental entities, and common law duties of care clearly exist." Id. at 921. As an abstract example, the court explained that, while determining the number of doctors to serve at a state medical facility may be a discretionary decision not subject to tort liability, malpractice in rendering particular medical services would constitute a breach of existing common law duties for which the governmental agency would be liable in tort. As a specific actual example, the court cited Rupp v. Bryant, 417 So.2d 658 (Fla. 1982) (supervision of public school students held not to be a discretionary function).
In summary, the Trianon Park court said governmental acts or omissions in categories I and II are not subject to tort liability, but there may be substantial governmental liability under categories III and IV, because of existence of common law duties of care respecting maintenance and operation of property, and performance of professional and general services.
In a recent opinion the Florida Supreme Court has cleared up seeming inconsistencies in the pertinent case law. In State of Florida, Department of Health and Rehabilitative Services v. Yamuni, 529 So.2d 258 (Fla. 1988), the court reviewed a Third District Court opinion in order to answer the following certified question:
Has the State of Florida, pursuant to section 768.28, Florida Statutes (1983), waived sovereign immunity for liability arising out of the negligent conduct of an HRS case worker?
The facts of Yamuni involved serious permanent injury, sustained by a child when left in the custody of his natural mother, after numerous reports to HRS that he was being physically abused.
The supreme court approved the district court's affirmance of the trial court's award to the child, and the district court's holding that HRS had a statutory and common law duty to the child, and that there was no sovereign immunity shielding the HRS worker's activities, which it characterized as being at an operational level.
In examining the threshold issue presented by HRS, of whether the actions of HRS caseworkers were planning level activities which were sovereignly immune under Commercial Carrier, the court applied the four preliminary questions of the Evangelical Brethren test, and determined that only to the fourth question could the answer be a definite yes. Because the answers to the other questions were in the negative, the preliminary indication was that the subject activities were at the nonimmune operational level. The supreme court declared that, in the context of Commercial Carrier, the definition of "discretion" is not the dictionary or everyday sense of the word, but, more narrowly, discretion at the policy-making or planning level. While theoretically an HRS caseworker may conceivably sometimes engage in discretionary activities, it is pragmatically unlikely, said the court; in Yamuni, the conduct had been at the operational level. On the above reasoning the supreme court answered the certified question with a qualified no, declining to recede from its *728 position in Commercial Carrier that the approach must be case by case.
Another HRS contention in Yamuni was that the waiver of immunity statute waives immunity only in circumstances wherein a private person would be liable. This reasoning, said the supreme court, was rejected in Commercial Carrier, because to accept it is to emasculate the waiver statute. The Yamuni court acknowledged that there was support for this contention in Reddish v. Smith, 468 So.2d 929, 932 (Fla. 1985), but characterized the Reddish language as dicta, explicitly receding from any suggestion therein that the statute does not waive immunity for activities performed by the government and not performed by private persons. Sovereign immunity continues only for government activities constituting basic policy-making decisions at the planning level. 529 So.2d at 261.
Also, in Yamuni, HRS argued that as a matter of law it could not be held liable for negligence in failing to prevent injury to the child, inasmuch as it has no legal duty to protect children from child abuse. It argued that its activity fell in category II of Trianon Park, for which there is sovereign immunity and no duty of care.
The supreme court responded that the subject activity of HRS in connection with child abuse cases reported to it falls within Trianon Park category IV. For such activities, immunity is waived, and there is a duty of care. Of particular significance is the court's characterization of the Trianon Park categories as only a rough guide, asserting that the proper test for determining governmental immunity remains the Commercial Carrier operational versus planning dichotomy. Additionally, the supreme court analyzed portions of the Child Abuse Statute, Chapter 827, Florida Statutes, and concluded that thereunder HRS has a statutory duty to prevent further harm to children when reports of abuse are received.
Yamuni teaches us that it remains appropriate to apply the four preliminary questions borrowed in Commercial Carrier from Evangelical Brethren. We find that, in the case at bar, at least as to questions two and three the answers are no: the act or omission being sued upon was not essential to realization of a basic policy, nor did it require exercise of basic policy evaluation, judgment and expertise by the HRS personnel. HRS thus is not immune out of hand; further inquiry is in order.
The following quotation in Rupp from 63 Am.Jur.2d Public Officers and Employees § 293 (1972) apparently continues to state correct Florida law:
As a rule a public officer is answerable to private persons who sustain special damage resulting from the negligent performance of the officer's imperative or ministerial duties, unless the wrong done is a violation of a duty which he owes solely to the public.
417 So.2d at 663. It is true that education, the area of governmental activity involved in Rupp, is explicitly identified in Trianon Park as a category IV function, whereas care for children at a detention facility is not. We think, however, that child care, even for delinquent children, is also often provided by private organizations; thus, assuming, arguendo, that, post-Yamuni, such a test remains meaningful, HRS's activity in the instant case falls within category IV. We cannot accept the thesis that intake operations at a juvenile detention facility ordinarily constitute discretionary policy-making acts of law enforcement, albeit there is a remote possibility that intake counselors on rare occasion engage in activities that rise to the level of policy-making.
Of course a governmental agency cannot have a duty to completely insure the safety of a child charged with delinquency who is temporarily in its care. But it would be ludicrous to conclude that the agency has no duty of ordinary care, or, having such duty, is nonetheless immune from liability for breach of the duty.
One of the stated purposes of the Florida Juvenile Justice Act is "[t]o assure to all children brought to the attention of the courts, either as a result of their misconduct or because of neglect or mistreatment *729 ... the care, guidance, and control ... which will best serve the moral, emotional, mental and physical welfare of the child and the best interests of the state." § 39.001(2)(b), Fla. Stat. Another purpose is to preserve and strengthen the child's family ties whenever possible; and, when it is found necessary to remove him, to secure for him custody, care and discipline as nearly as possible equivalent to what he ought to have received from his parents. § 39.001(2)(c), Fla. Stat. We urge that, if there is no common law duty imposed on HRS in the present circumstances, then the statute which sets up the above-recited purposes imposes such a duty of care on HRS during the time a child is directly in HRS's care. We submit that it would make no sense to hold that a child is entitled to a certain level of care before and after but not during the ministrations of HRS. Nor can we believe the Legislature has imposed on HRS a different level of care for dependent children and for allegedly delinquent children. The statutory statements of purpose cited above demonstrate that the Juvenile Justice Act is not solely an enactment for the benefit of the general public  albeit such a purpose is also stated  of the sort which ordinarily fails automatically to set up a duty to individual citizens. See Trianon Park, 468 So.2d at 917.
We suggest further that, if the intake operations of a HRS detention facility are not a category IV activity in the context of Trianon Park, then we can at least analogize to the distinction drawn in the Trianon Park analysis between discretionary acts of law enforcement and conduct of officers while driving a motor vehicle or handling a firearm in the course of enforcing compliance with law.
We think there is yet another rationale for HRS liability in the instant case. Even if it is held that in operating juvenile detention facilities HRS performs a police function and generally owes a duty to the public at large rather than to individuals, we think that once HRS takes custody of a juvenile it undertakes a duty of protection for the benefit of that child. We derive this by analogy from the actionable duty of governmental entities to provide police services said to arise toward an individual when some form of privity has arisen between the police and that person which sets that person apart from the general public, and where there have been assurances, explicit or implicit, giving rise to reliance by the victim. This principle, which is stated in Chambers-Castanes v. King County, 100 Wash.2d 275, 669 P.2d 451 (1983), is derived in part from pronouncements of Florida courts in City of Tampa v. Davis, 226 So.2d 450, 454 (Fla. 2d DCA 1969), and Sapp v. City of Tallahassee, 348 So.2d 363, 365-66 (Fla. 1st DCA), cert. denied, 354 So.2d 985 (1977). Cf. Leibman v. Burbank, 490 So.2d 218 (Fla. 4th DCA 1986) (no special relationship created where officer, on way to burglary, checked and found functional lights and flashers of vehicle being pushed by appellants, and then went on his way). See also Sanders v. City of Belle Glade, 510 So.2d 962 (Fla. 4th DCA 1987).
Accordingly, we believe HRS has a duty, while it holds an alleged juvenile delinquent in its custody, to protect that child from potential harm by third persons where the risk of such harm is foreseeable. We note that Restatement (Second) of Torts § 320 (1965) imposes on a person or agency having custody of another, under circumstances that subject him to association with persons likely to harm him, the duty to control the conduct of third persons in order to prevent the harm, where the actor knows or reasonably should know that he can control that conduct, and knows or should know the need and opportunity for exercising that control.
On the basis of the foregoing analysis we conclude that sovereign immunity does not shield HRS from liability in the instant suit. We observe, in passing, that part II of chapter 284, Florida Statutes, creates, under the aegis of the Department of Insurance, a state self-insurance fund, which is to provide insurance to the departments for general liability, among other risks.
*730 We do not think the harm that needed to be foreseeable in the instant case had to be specifically the propensity of the third parties to commit sexual battery. According to the first intake person's testimony, an interim placement report accompanying Willie Jones explicitly showed Jones was given to aggressive and violent conduct; there was another holding cell in which the other boys could have been placed; but the intake counselor did not at the time give this alternative placement a thought. The second intake screener testified that, according to the training manuals, his supervisors and his own experience, people in his capacity are charged with the welfare and security of the children that come into their custody. He agreed that the manual covering Security at Intake Screening Unit requires consideration of the sex of the youth, age, attitude and potential for violence when one is placing a youth in a holding cell. There was also testimony which showed that the available surveillance system for monitoring the holding area was palpably inadequate.
We think it was proper to let the jury decide whether HRS was liable for assigning Whaley and the other boys to the same holding cell and for delay in processing Whaley into the dormitory section of the facility, given the actual or constructive knowledge of Jones's proclivity toward violence. As to failure to render emergency medical or psychiatric treatment, we think the question properly went to the jury even though there was no explicit showing of injury resulting from such omission. Expert testimony on whether delay in a sexual crime victim's receipt of mental health care can aggravate the psychological effects of the attack was not essential.
HRS urges that the trial court erred in admitting exhibit 18, consisting of additional records revealing Jones's propensity toward violence  records not available to the intake personnel when Whaley was waiting in the holding room. Properly admitted was a document the intake personnel did have at that time, which revealed the same danger. We think exhibit 18 was cumulative to other evidence. Any error in its admission was harmless.
Finally, we see no reason why evidence of Whaley's subsequent delinquent behavior should have been admitted, as HRS urges in its fourth point on appeal. That information does not bear upon whether Whaley suffered damages while in the holding room, or whether HRS could be held liable.
We affirm. Nevertheless, in light of the decisions in this state that have held that cell assignment or classification and placement of inmates in the adult prison setting constitutes a discretionary function protected by sovereign immunity,[1] we certify the following as a question of great public importance:
IS THE ASSIGNMENT OR PLACEMENT OF ALLEGED JUVENILE DELINQUENTS IN A PARTICULAR ROOM OR LOCATION IN AN HRS DETENTION FACILITY AN INHERENTLY GOVERNMENTAL FUNCTION (ENFORCEMENT OF LAWS AND PUBLIC SAFETY PROTECTION) OR A DISCRETIONARY GOVERNMENTAL FUNCTION, WHICH IS PROTECTED BY SOVEREIGN IMMUNITY?
DOWNEY, ANSTEAD and GLICKSTEIN, JJ., concur.
NOTES
[1] Reddish v. Smith, 468 So.2d 929 (Fla. 1985); Davis v. State, Dept. of Corrections, 460 So.2d 452 (Fla. 1st DCA 1984), pet. for review dismissed, 472 So.2d 1180 (1985); Ursin v. Law Enforcement Ins. Co., 450 So.2d 1282 (Fla. 2d DCA 1984), approved on authority of Reddish, 469 So.2d 1382 (1985). See also Berry v. State, 400 So.2d 80 (Fla. 4th DCA), rev. denied, 411 So.2d 380 (1981) (the determination to grant parole is a discretionary planning function); State v. Ferling, 220 Md. 109, 151 A.2d 137 (1959) (superintendent of reformatory was a public officer and his duties in safely confining a juvenile inmate were public in character and quasi-judicial in nature, in that they involved the exercise of discretion).