574 So.2d 100 (1991)
DEPARTMENT OF HEALTH & REHABILITATIVE SERVICES, Petitioner,
v.
David WHALEY, Etc., Respondent.
No. 73344.
Supreme Court of Florida.
January 10, 1991.
Rehearing Denied February 20, 1991.
*101 Michael B. Davis of Davis, Hoy & Diamond, P.A., West Palm Beach, for petitioner.
Richard A. Kupfer of Wagner, Nugent, Johnson, Roth, Romano, Eriksen and Kupfer, P.A., and Babbitt and Hazouri, P.A., West Palm Beach, for respondent.
McDONALD, Justice.
In State Department of Health & Rehabilitative Services v. Whaley, 531 So.2d 723, 730 (Fla. 4th DCA 1988), the district court affirmed a judgment holding the Department of Health and Rehabilitative Services (HRS) liable for negligently assigning alleged juvenile delinquents to a holding cell and certified the following question as being of great public importance:
IS THE ASSIGNMENT OR PLACEMENT OF ALLEGED JUVENILE DELINQUENTS IN A PARTICULAR ROOM OR LOCATION IN AN HRS DETENTION FACILITY AN INHERENTLY GOVERNMENTAL FUNCTION (ENFORCEMENT OF LAWS AND PUBLIC SAFETY PROTECTION) OR A DISCRETIONARY GOVERNMENTAL FUNCTION, WHICH IS PROTECTED BY SOVEREIGN IMMUNITY?
We have jurisdiction pursuant to article V, section 3(b)(4), Florida Constitution. We hold that the assignment of juveniles to a particular room or location in an HRS detention facility is an operational function not protected by sovereign immunity and approve the district court's decision.
On March 15, 1982 police arrested Michael Whaley, a fourteen-year-old white youth, and two companions, John Ahrens and Thomas Parker, for burglary and took them to a juvenile detention center run by HRS around 6:00 p.m. Because the acts charged would have been felonies if committed by adults, the intake counselor had to obtain authorization for detention from the state attorney's office. The counselor received that authorization at 7:30 p.m. and contacted the boys' parents, reaching Ahrens' parents at 7:20 p.m., Whaley's stepmother at 7:50 p.m., and Parker's parents at 8:15 p.m. The intake counselor then notified the center's master control that the three youths were ready for admission and orientation, and master control processed Ahrens and Parker into the detention center. Whaley, however, remained in the intake unit, even though the intake counselor reminded master control several times that he could be moved to the detention center. Whaley stayed alone in holding cell number two, while the counselor placed two other youths, a thirteen-year-old with no violent background charged with burglary and a sixteen-year-old dependent, who was not charged with a crime, in the other holding cell, number one. The doors of these cells remained open, general practice in the intake unit so that the counselor could hear any noise from the cells located fifteen to twenty feet away from the counselor's office.
At approximately 11:00 p.m. Glenn Moore, a fifteen-year-old black youth, arrived at the intake unit. Documents accompanying Moore indicated that he had a prior criminal history involving assault. The counselor placed Moore, about six feet, two inches tall and about 160 pounds, in cell number two with Whaley. Whaley, five feet, four inches tall and 98 pounds, was asleep on the bench in the cell at that time.
At 11:20 p.m. Willie Jones, a sixteen-year-old black youth, came into the intake unit, having been arrested for armed robbery. Jones' interim placement report indicated that he previously had been charged with several violent crimes, most of which had been nolle prossed and none of which involved sexual assault. The counselor assigned Jones, six feet, two inches tall and 195 pounds, to cell number two with Moore and Whaley.
*102 Shortly after 11:30 p.m., the night intake counselor arrived, was advised of the status of the youths in the unit, and checked on them while the intake counselor who had assigned the boys to their cells prepared to leave. The night counselor also called master control with a reminder that the youths were ready for processing. The counselor checked on the youths at midnight, but at 12:20 a.m. he heard a sound from the cells and went to investigate. Noticing that the door to cell number two was nearly closed, he opened the door and saw Whaley on his knees in front of Moore with Jones standing to the side; Moore had his hands around Whaley's neck, and Moore's pants were unzipped. When the counselor entered the room, the boys moved apart, and the counselor removed Whaley from the room and asked him if he had been hurt. According to the counselor, Whaley indicated that he was not hurt, but that he had been threatened. The counselor also testified that Whaley's face and neck were flushed but that he otherwise appeared unharmed.
The counselor kept the boys separated and again called master control, reporting that a situation had occurred and that the boys had to be moved immediately. Master control processed Whaley into the detention center shortly thereafter. HRS investigated the incident and ultimately concluded that Whaley had been the victim of a sexual assault.
Several months after the incident, Whaley began seeing a psychiatrist concerning his nightmares and his fear of blacks in groups. Whaley's psychiatrist and a psychologist testified that Whaley suffered from post-traumatic stress syndrome due to the incident at the detention center and from an adolescent conduct disorder which pre-existed the incident.
Whaley's initial complaint asserted a civil rights claim under 42 U.S.C. § 1983 and several common law tort claims. The trial court struck the 1983 claims, and Whaley went to trial on the tort claims, arguing that sovereign immunity had been waived by section 768.28, Florida Statutes (1981). The jury returned a special verdict finding that: (1) HRS was negligent in placing Jones and Moore in the same holding cell as Whaley; (2) HRS was negligent in allowing Whaley to remain in a holding cell for an extended period of time; (3) HRS was not negligent in its supervision of the holding cells; and (4) HRS was negligent in failing to provide Whaley with immediate medical and psychiatric care. The jury awarded damages to Michael Whaley in the amount of $100,000 and to his father, David Whaley, in the amount of $10,000, of which the trial court ordered a remittitur of $4,415.
On appeal the district court found that HRS has a duty while detaining a juvenile to protect him from potential harm by third persons and that "it was proper to let the jury decide whether HRS was liable for assigning Whaley and the other boys to the same holding cell and for delay in processing Whaley into the dormitory section of the facility, given the actual or constructive knowledge of Jones's proclivity toward violence." 531 So.2d at 730. It concluded that sovereign immunity did not shield HRS from liability under the circumstances of this case. After so holding, the district court recognized that the primary issue in this case is whether HRS owes a common law duty of care in assigning to places of detainment juveniles charged with or convicted of criminal offenses and certified its question to us.
HRS argues that the holding cell assignments in this case constituted discretionary acts for which sovereign immunity has not been waived under the tests set out in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979), and Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912 (Fla. 1985).[1] We considered a similar argument *103 regarding so-called discretionary acts in Department of Health & Rehabilitative Services v. Yamuni, 529 So.2d 258, 260 (Fla. 1988), and stated:
HRS nevertheless argues that the caseworkers were exercising discretion in handling the reported child abuse and that their actions were planning level activity under Commercial Carrier. This argument is grounded on the definitional approach to "discretion" which we ... rejected because "all governmental functions, no matter how seemingly ministerial, can be characterized as embracing the exercise of some discretion in the manner of their performance." [Commercial Carrier,] 371 So.2d at 1021. We have no doubt that the HRS caseworkers exercised discretion in the dictionary or English sense of the word, but discretion in the Commercial Carrier sense refers to discretion at the policy-making or planning level. We agree with the district court that the actions of caseworkers investigating and responding to reports of child abuse simply cannot be elevated to the level of policy-making or planning.
Operational level acts, therefore, are not necessary to or inherent in policy or planning, but, rather, reflect only secondary decisions for implementing discretionary plans and policies. Kaisner v. Kolb, 543 So.2d 732 (Fla. 1989). We went on in Yamuni to hold that the caseworker activities at issue constituted operational level acts for which immunity had been waived. 529 So.2d at 260. Similarly, the instant intake counselors' actions were operational level acts implementing HRS' discretionary policies.
A governmental employee's negligence that proximately causes injury to another entitles the injured party to redress. Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957). Deciding whether to take someone into custody is a discretionary act for which sovereign immunity has not been waived. Everton v. Willard, 468 So.2d 936 (Fla. 1985). A person taken into custody, however, "is owed a common law duty of care." Kaisner, 543 So.2d at 734. Numerous cases have recognized that this duty of exercising reasonable care exists and that it is an operational level function. E.g., Kaisner; Dunagan v. Seely, 533 So.2d 867 (Fla. 1st DCA 1988); Sanders v. City of Belle Glade, 510 So.2d 962 (Fla. 4th DCA 1987); Spann v. State, Department of Corrections, 421 So.2d 1090 (Fla. 4th DCA 1982), review denied, 430 So.2d 452 (Fla. 1983); White v. Palm Beach County, 404 So.2d 123 (Fla. 4th DCA 1981). Accord Restatement (Second) of Torts § 320 (1965).[2] To find that a custodian *104 breached the duty of reasonable care, a plaintiff must show the injury to have been a reasonably foreseeable consequence of the custodian's negligence. Spann; Restatement (Second) of Torts § 320 (1965). See Kaisner; Sanders.
We agree with the district court's conclusion that "HRS has a duty, while it holds an alleged juvenile delinquent in its custody, to protect that child from potential harm by third persons where the risk of such harm is foreseeable." Whaley, 531 So.2d at 729. As stated earlier, we answer the certified question by holding that assigning juveniles to particular locations in an HRS detention facility is an operational level act not protected by sovereign immunity. We approve the district court's decision.
It is so ordered.
SHAW, C.J., and KOGAN, J., and EHRLICH, Senior Justice, concur.
OVERTON, J., dissents with an opinion, in which GRIMES, J., concurs.
BARKETT, J., recused.
OVERTON, Justice, dissenting.
The majority has held that HRS has a duty to protect a juvenile who is in its custody and is charged with a felony, "`from potential harm by third persons where the risk of such harm is foreseeable,'" Maj. op. at 103 (quoting State Department of Health & Rehabilitative Services v. Whaley, 531 So.2d 723, 729 (Fla. 4th DCA 1988)), and that the state may be held liable for negligently "assigning juveniles to particular locations in an HRS detention facility." Maj. op. at 104. I would agree that the state would have been liable for this incident had the jury found HRS negligent in its supervision of this detention facility. However, the jury in this case expressly found that HRS was not negligent in its supervision of the holding cells. In Reddish v. Smith, 468 So.2d 929 (Fla. 1985), this Court held that the classification and assignment of prisoners within the state prison system was "an inherent feature of the essential governmental role." Id. at 931. We concluded that a tort claim against the state based upon that role was precluded by sovereign immunity.
In Department of Health & Rehabilitative Services v. Yamuni, 529 So.2d 258 (Fla. 1988), this Court found that HRS had a statutory and common law duty to an infant who suffered injuries as a result of child abuse, when HRS failed to place the infant under protective supervision in violation of a court order. The majority has distinguished between the duty of the Department of Corrections in classifying and assigning a prisoner to a cell and HRS's duty in assigning a delinquent child charged with a felony offense by explaining: "HRS' statutory duties toward children are, ultimately, the main difference between this case and prisoner cases such as Reddish and Davis, and we decide this *105 case solely on HRS' duty, not the duty of any other governmental agency." Maj. op. at 102-03 n. 1.
In Yamuni, we were addressing the responsibility of HRS to a dependent child who, by court order, was entitled to protective custody to assure his health and welfare. In contrast, Michael Whaley was charged in this instance with a felony, and HRS was holding him in custody pursuant to its role in enforcing the laws and protecting the public. The role of government in protecting children from child abuse, as explained in Yamuni, is clearly different from the governmental functions carried out by HRS detention center staff in determining in which cell to place an alleged delinquent charged with a felony offense. I find that HRS was performing the same function as that performed by the Department of Corrections and the county sheriffs in operating adult prisons or jails. I find that the law, as set forth in Reddish, Ursin v. Law Enforcement Insurance Co., 450 So.2d 1282 (Fla. 2d DCA 1984), approved, 469 So.2d 1382 (Fla. 1985), and Davis v. State, Department of Corrections, 460 So.2d 452 (Fla. 1st DCA 1984), controls. I find no difference between the assignment of a fourteen-year-old charged with a felony offense to a holding cell in a juvenile facility and the assignment of an eighteen-year-old charged with the same felony offense to a holding cell in a county jail. The inherent governmental function is the same and the law should be the same.
Further, I agree with the district court that there was insufficient evidence in the record to justify liability based on HRS's failure to provide immediate medical and psychiatric care. Given the circumstances of this case, I find that Reddish controls, and I would quash the decision of the district court of appeal and remand for entry of judgment in favor of the Department of Health and Rehabilitative Services.
GRIMES, J., concurs.
NOTES
[1] HRS also relies on Reddish v. Smith, 468 So.2d 929 (Fla. 1985), receded from in part, Department of Health & Rehabilitative Services v. Yamuni, 529 So.2d 258 (Fla. 1988), and Davis v. State, Department of Corrections, 460 So.2d 452 (Fla. 1st DCA 1984), review dismissed, 472 So.2d 1180 (Fla. 1985). We find those cases distinguishable. The complaint in Reddish "was based on the classification and assignment of Prince and not on the possible negligence of the department's employees having a direct and operational-level duty to supervise him and keep him confined at the time of his escape." 468 So.2d at 931-32. Likewise, the complaint in Davis hinged "upon allegations of negligence at the planning level, such as in the classification of prisoners or in the policies adopted for their supervision." Dunagan v. Seely, 533 So.2d 867, 868 (Fla. 1st DCA 1988). Here, however, the complaint alleged that individual HRS employees violated their duty of exercising reasonable care, and, while the jury found HRS not negligent in its supervision of the general running of the holding cells, it found HRS negligent through the acts of its employees specifically directed at Whaley. Moreover, Reddish is further distinguished because the department of corrections has no specific duty to protect individual members of the public from escaped inmates while HRS has specific statutorily imposed duties to protect children. See Yamuni. HRS' statutory duties toward children are, ultimately, the main difference between this case and prisoner cases such as Reddish and Davis, and we decide this case solely on HRS' duty, not the duty of any other governmental agency.
[2] This section of the Restatement (Second) of Torts reads as follows:

§ 320. Duty of Person Having Custody of Another to Control Conduct of Third Persons
One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor
(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and
(b) knows or should know of the necessity and opportunity for exercising such control.
The comments to § 320 provide in pertinent part:
a. The rule stated in this Section is applicable to a sheriff or peace officer, a jailer or warden of a penal institution, officials in charge of a state asylum or hospital for the criminally insane, or to teachers or other persons in charge of a public school. It is also applicable to persons conducting a private hospital or asylum, a private school, and to lessees of convict labor.
b. Helplessness of other... . the actor who takes custody of a prisoner or of a child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him.
c. Peculiar risks to which other exposed. The custody of another may be taken under such circumstances as to associate the other with persons who are peculiarly likely to do him harm from which he cannot be expected to protect himself. If so, the actor who has taken custody of the other is required to exercise reasonable care to furnish the necessary protection. This is particularly true where the custody not only involves intimate association with persons of notoriously dangerous character, but also deprives the person in custody of his normal ability to protect himself, as where a prisoner is put in a cell with a man of known violent temper... .
d. Duty to anticipate danger. One who has taken custody of another may not only be required to exercise reasonable care for the other's protection when he knows or has reason to know that the other is in immediate need of it, but also to make careful preparations to enable him to give effective protection when the need arises, and to exercise reasonable vigilance to ascertain the need of giving it.