599 So.2d 123 (1992)
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, STATE OF FLORIDA, Petitioner,
v.
STATE of Florida, and J.L.B., a Child, et al., Respondent.
Nos. 91-2269 to 91-2273, 91-2283 and 91-2284.
District Court of Appeal of Florida, Fifth District.
March 27, 1992.
Rehearing and Rehearing Denied June 3, 1992.
Linda K. Harris, Deputy General Counsel, Dept. of Health and Rehabilitative Services, Tallahassee, for petitioner.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Belle B. Turner, Asst. Atty. Gen., Daytona Beach, for respondent.
Rehearing and Rehearing En Banc Denied June 3, 1992.
GRIFFIN, Judge.
The Department of Health and Rehabilitative Services ("HRS") has applied to this court for writs of certiorari in seven juvenile cases, which we have consolidated by prior order based upon the apparent identity of issue in all cases. The writ applications all seek reversal of lower court orders placing each of these seven juveniles in detention even though the detention risk assessment instrument (the "RAI")[1] prepared by HRS for each youth does not reflect that any form of detention is appropriate. In all of these cases save one the *124 challenged orders place the juvenile in home detention.
In each case, the RAI (identified as HRS-CYF Form 2049, effective January 19, 1991) as completed by HRS personnel, reflects a negative answer to the predicate detention criteria numbered one through four. The RAI criteria track the language of section 39.044(2)(a) through (d), Florida Statutes (1991) which governs the use of detention prior to an adjudicatory hearing. In essence, HRS contends that the orders placing these juveniles in detention depart from the essential requirements of the law because the HRS risk assessment forms show the youths do not qualify for detention. HRS urges that the trial court may not order detention contrary to the RAI unless the trial court states, in writing, clear and convincing reasons for such more restrictive placement, as specified in section 39.044(2).
The reason HRS objects to these detention orders is largely financial. District 7, specifically Orlando, has the second highest home and non-secure caseloads in the state, and the Ninth Circuit (Orange County) has the state's highest number of dependents placed in secure detention for contempt. HRS complains that it costs them $56.65 per day to hold a juvenile in secure detention, that the Orlando Regional Detention Center is the most overcrowded center in Florida at 150 percent of capacity, that there were 122 assaults there last year and that 6,390 hours of unbudgeted overtime were required. HRS also complains that because it is, by statute,[2] required to supervise juveniles in both secure and nonsecure detention, it is exposed to liability if injury to any of these juveniles occurs. Dep't of Health and Rehabilitative Services v. Whaley, 574 So.2d 100 (Fla. 1991). We have received no application for appellate review by any of the seven juveniles nor is there any suggestion that these juveniles or their counsel object to the applicable detention order.
If the case filings in this court are any measure, this new statutory scheme for detention of juveniles is not working very well in Orange County.[3] Due to the unusual procedural posture of this case,[4] we invited a response from all involved parties, including the judge of the lower court in each case; however, only the Office of the Attorney General responded. The Attorney General contends principally that HRS has no standing. Accordingly, we have been left to guess what this dispute is really all about. The recent revisions to the Rules of Juvenile Procedure in light of the 1990 statutory amendments are not helpful. The amended rules make no reference to the RAI and no material changes were made in the detention hearing rule. In re Petition of the Florida Bar to Amend The Florida Rules of Juvenile Procedure, 589 So.2d 818, 819 (Fla. 1991).
A cynic reviewing these risk assessment scores might be moved to conclude that HRS has found a way to solve the financial burdens of detention. The fewer who qualify for detention, the lighter the burden on HRS. But this may not be attributable to HRS. In crafting this legislation, the legislature has very narrowly defined the circumstances under which the court may order detention. §§ 39.042 through -.044(2), Fla. Stat. (1991). The legislature has clearly concluded that pre-adjudication detention of a juvenile should not be permitted unless he or she is an escapee or fugitive, or is charged with a very serious offense.[5]Cf. D.B. v. State, 544 So.2d 1108 (Fla. 1st DCA 1989). Although the language of section 39.042 is broad ("All *125 determinations and court orders regarding the use of secure, non-secure or home detention... ."), its reach is more limited. It would not logically be applicable in contempt cases. § 39.044(10), Fla. Stat. (1990); B.P. v. State, 588 So.2d 39 (Fla. 5th DCA 1991).
Chapter 39 is a difficult piece of legislation. It does appear the legislature intended that when a juvenile is initially taken into custody by law enforcement, HRS must research and compile, in a useful format, information pertinent to a decision whether to place the juvenile in detention and, if so, at what level. § 39.044(1)(a), (b), Fla. Stat. This is the risk assessment instrument. If the RAI scores affirmatively one of the four predicate criteria, a numerical score is then developed for the juvenile, taking into account a variety of factors primarily related to prior criminal history. A score above six points on the RAI qualifies the juvenile for home detention. As the score increases, the authorized detention level becomes more restrictive.
If the juvenile qualifies for some level of detention, he has to be given a hearing within twenty-four hours to determine probable cause that the juvenile has committed a violation of law and to determine whether detention should continue. § 39.044(2)(d), Fla. Stat. (1991). The juvenile judge appears to be charged with making an independent determination whether the statutory detention criteria warrant continued detention. If the judge concludes it is best to release the youth, he may do so. If he wishes to keep the youth in the same level of detention, he may do that as well. However, if the court intends to order a more restrictive placement than the one scored on the RAI, the court must either identify (and correct) material errors in the completed RAI, or articulate in writing clear and convincing reasons to support the decision. § 39.044(2)(d), Fla. Stat. (1991). The position taken by HRS in these petitions appears to be that, by stating clear and convincing reasons, the court could order detention for a juvenile who does not meet one of the four predicate criteria. It appears to us, however, that the statute only authorizes the court to make a more restrictive placement for a juvenile who otherwise qualifies for detention. It does not authorize any form of detention where release is correctly indicated on the RAI. See also § 39.044(9), Fla. Stat. (1991).
None of these seven cases involves the simple post-arrest/pre-adjudicatory hearing circumstances for which section 39.044(2) was most obviously designed. All involve a circumstance where the juvenile was alleged to have violated previously imposed community control,[6] had pled guilty to a violation of community control,[7] or had pled guilty to some criminal offense.[8]
In Case No. 91-2284, the first page of the RAI form reflects that the juvenile is alleged to have committed a "felony drug offense/assault or battery." None of the four predicate RAI criteria were scored. Item number four of the RAI form shows a negative answer to the question whether:
the youth is charged with a serious property crime as described in s. 810.02(2) or (3) [burglary] or s.812.014(2)(c)4 [grand theft auto], any offense involving the use of a firearm, or any second-degree or third-degree felony involving a violation of Chapter 893 [felony drugs] ...
The trial court, using a detention order containing virtually identical language, marked "Yes" to this question. The court then considered the next prong of the statutory test and affirmatively found that the youth also had a record of law violations *126 prior to court hearings, which established the youth met the statutory predicate for detention.
In J.B. v. State, Case No. 91-2269, the RAI shows charges against the juvenile include "felony drug" and "misdemeanor marijuana". There is also a computer printout showing this juvenile had a 1987 sexual battery charge reduced to a lesser charge, was on HRS community control for another felony sexual offense committed in 1987 and was also on community control for a 1990 assault and battery. The juvenile pled guilty to violation of community control, and the court expressly found he possessed cannabis and violated curfew. The risk assessment form was marked negative for all criteria.
Cases like J.B. raise the question whether a juvenile who has had an adjudicatory hearing, was placed on community control, and who then violates community control can be placed in any level of detention. The position taken by HRS is that detention is impossible unless the violation is the commission of a new offense that itself meets one of the predicate criteria for detention. This interpretation would mean that a juvenile placed on community control after an adjudicatory hearing for a serious "detention qualifying" felony could not be placed on detention even after violating that community control if the violation was a criminal offense that did not meet one of the statutory predicate detention criteria. To our minds, that is an absurd result that the legislature could not have intended.[9]
There are only two ways we can see that such an illogical result could be avoided: either the legislature did intend to allow the court to order detention after commission of a nonqualifying offense by identifying as a "clear and convincing reason" that the juvenile is alleged to have violated community control; or, alternatively, the RAI predicate criteria "score" applies to both the current offense (if there is one) and the underlying offense for which the juvenile violated his community control. As stated above, since the relatively plain language of section 39.044 cannot support the first alternative, we are left with the second as being most consistent with the manifest legislative intent to make detention available to restrain juveniles who commit serious offenses.[10]
Another feature several of these cases have in common is contempt. Case Nos. 91-2271,[11] 91-2273 and 91-2269 all reflect in the detention order that the juvenile was taken into custody in open court based on a finding of "probable cause" that the juvenile was in contempt of court. The "contempt" is not identified. The state equates this probable cause finding with a finding of contempt.
"Contempt" is apparently a key device used by the juvenile court to access detention for juveniles who are under court supervision for prior offenses. See L.M. v. State, 592 So.2d 1210 (Fla. 2d DCA 1992). There is authority for use of contempt as a sanction for violation of community control[12] and we have recently held that secure detention is an appropriate sanction for indirect contempt by a juvenile. B.P., 588 So.2d 39.
Prior to the 1990 revisions to the Florida Juvenile Justice Act, the statute contemplates *127 a juvenile might be placed in detention based either on an allegation, or a finding, of contempt. § 39.032(5)(c), Fla. Stat. (1989). Compare § 39.01(9), Fla. Stat. (1989). The new contempt provision, section 39.044(10), Florida Statutes (1991) expressly provides that detention is appropriate for contempt, but the prior reference to "allegation" has been deleted. See also § 39.01(9), Fla. Stat. (1991).
The Second District Court of Appeal, in L.M., recently held that detention based solely on contempt requires prior compliance with the newly enunciated procedural requirements of section 39.044(10). We agree with the conclusion reached by the Second District Court because its holding seems most consistent with due process. Section 39.044(10) is so imprecise, however, that in light of the prior law allowing detention predicated on an allegation of contempt, the legislature's true intent is a matter of conjecture. The rules of juvenile procedure make no reference to use of detention before an adjudication of contempt. The former rule referred to "arrest" of a juvenile accused of contempt if the court had reason to believe the accused would not appear in response to the order to show cause. Fla.R.Juv.P. 8.280(c). The new rule is essentially the same. Fla.R.Juv.P. 8.150(b)(3).
In light of our interpretation of the detention scheme in chapter 39, we agree with the state that HRS has not established that the lower court's orders depart from the essential requirements of the law. Nor are we convinced that HRS is correctly scoring these juveniles. The state has complained with justification that HRS has failed to provide the record necessary to support the grant of the writs, but HRS has steadfastly contended that no more is necessary than the RAI and the challenged order in each case. Furthermore, even assuming HRS has the requisite standing to seek certiorari review of the challenged court orders, we are reluctant to exercise our discretionary jurisdiction to interfere with the already impossible task of juvenile judges in cases where the juveniles themselves have not complained.
WRITS DENIED.
DAUKSCH and HARRIS, JJ., concur.
NOTES
[1] § 39.042(3)(a), Fla. Stat. (1991).
[2] §§ 39.01(16)(b), (c), Fla. Stat. (1991).
[3] So far, we have eleven of these cases.
[4] This case was initially filed by HRS as an alternative petition for certiorari, mandamus or prohibition.
[5] See W.N. v. Fryer, 572 So.2d 24 (Fla. 4th DCA 1990) in which the juvenile had committed a trespass, an offense that would not qualify for detention, and then failed to appear for a court hearing. The court ordered him placed in secure detention. The appellate court granted habeas corpus on the basis that he could not be held without meeting the requirements of section 39.044. The state argued the criteria applied only to continued detention, not an initial detention. The court concluded that under section 39.044, this was a continued detention.
[6] In 91-2272, the juvenile was on community control for grand larceny when he failed to appear at a scheduled court hearing. In 91-2283, the juvenile was charged with "technical violation of community control," "other felony, and retail theft." No RAI factors were scored.
[7] In Case No. 91-2273, the juvenile pled guilty at arraignment to violation of community control and contempt. The detention admission criteria on the juvenile's RAI are, again, all marked negative.
[8] In Case No. 91-2270, the state asserts that the juvenile had previously pled guilty to trespass; before sentencing, he was placed on home detention at his parent's request because he was not attending school.
[9] The prior 39.03(1)(c), Florida Statute (1989), which authorized the taking into custody of a juvenile alleged to have violated community control, was deleted in the 1990 revision. § 39.037, Fla. Stat. (1991). See also § 39.054(1)(4), Fla. Stat. (1991).
[10] We also find some support for this interpretation on the RAI form. On page one, the list of the juvenile's offenses is directed to be "continuous".
[11] In Case No. 91-2271, the child was placed in home detention on October 8, 1991 even though, as HRS argues, the record reflects no prior status or violations warranting detention. On October 21, however, he pled guilty to contempt. Even if the home detention were illegal prior to October 21, it became moot before we could act.
[12] In Perez v. State, 590 So.2d 1138 (Fla. 3d DCA 1992), the court held that violation of a probation order by using an alias would constitute indirect criminal contempt; in R.M.P. v. Jones, 419 So.2d 618 (Fla. 1982), violation of a dependency order was punished by contempt. See also B.P., 588 So.2d 39, involving contempt for violation of a "probation" order requiring payment of traffic citations.