665 So.2d 304 (1995)
STATE of Florida, DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellant/Cross-Appellee,
v.
Levada LEE, Individually and as Mother and Legal Guardian of D.L., Incompetent, Appellee/Cross-Appellant.
Nos. 93-1350, 93-1411.
District Court of Appeal of Florida, First District.
December 13, 1995.
Laura Rush, Assistant Attorney General, Office of the Attorney General, Tallahassee; Kimberly J. Tucker, General Counsel, Department of Health and Rehabilitative Services, Tallahassee; and Edwin R. Hudson of Henry, Buchanan, Mick, Hudson & Suber, P.A., Tallahassee, for Appellant/Cross-Appellee.
Dean R. LeBoeuf and Rhonda S. Bennett of Brooks & LeBoeuf, P.A., Tallahassee, for Appellee/Cross-Appellant.
BOOTH, Judge.
This cause is before us on appeal from a final judgment entered on a jury verdict against the Department of Health and Rehabilitative Services (hereinafter "HRS") for damages arising from its alleged negligent supervision of D.L., a resident of Sunland-Marianna who became pregnant while in HRS' care.
*305 The facts are essentially undisputed. D.L., a 40-year-old severely retarded woman, gave birth to a normal child in 1988. The father and the circumstances of the child's conception are not known. Based on a medical approximation of D.L.'s date of conception and its own records, HRS acknowledges that D.L. must have been in its care when she conceived.
D.L.'s mother and legal guardian, Levada Lee (hereinafter "Lee"), sued HRS, generally asserting in her complaint that HRS must have at some point negligently supervised D.L. in order for her to have become pregnant.[1] Lee was unable to allege in her complaint, or establish at trial, the specific circumstances leading to D.L.'s impregnation or any specific acts of HRS' negligence relating thereto, but essentially contended that HRS should have more strictly supervised D.L.[2]
The trial resulted in a verdict and judgment for Lee, followed by HRS' appeal. This court ordered additional briefing on the issue of sovereign immunity,[3] with particular reference to the recent Florida Supreme Court decision in Department of Health and Rehabilitative Services v. B.J.M., 656 So.2d 906 (Fla. 1995).
In B.J.M., supra, the Florida Supreme Court reaffirmed its commitment to the "Evangelical Brethren test" as a basis for determining whether activity is "discretionary" or "operational." The test requires that the court resolve four preliminary questions related to the activity alleged to have caused the harm.[4] However, the instant case lacks the allegations and proof needed to apply this test.[5]
Further, the general nature of the allegations made and the absence of specific allegations or proof leads us to conclude that Lee is actually challenging HRS' policies regarding supervision, rather than any specific operational *306 negligence. The Florida Supreme Court held in B.J.M., supra at 913:
[W]e distinguish the HRS function at issue, the allocation of services, from the actions at issue in Department of Health & Rehabilitative Services v. Whaley, 574 So.2d 100 (Fla. 1991), and Department of Health and Rehabilitative Services v. Yamuni, 529 So.2d 258 (Fla. 1988). Both Whaley and Yamuni involved HRS caseworker-level decisions concerning the physical safety of children within the agency's protective custody which did not implicate any "discretionary planning or judgment function" as contemplated by Trianon [Park Condominium Ass'n, Inc. v. City of Hialeah, 468 So.2d 912 (Fla. 1988)]. [(Emphasis added).]
Since no specific operational function is involved here, such as, for example, an "HRS caseworker-level decision," the Whaley and Yamuni cases are distinguishable from the present case just as they were distinguishable from B.J.M.[6]
The Florida Supreme Court further held in B.J.M., supra at 913:
These operational level decisions [of HRS caseworkers] exposing children to specific dangers should be distinguished from the broad discretionary authority vested by the legislature in HRS to determine an appropriate course of remedial treatment for the children that come within its custody through dependency and delinquency proceedings.
To like effect are the decisions in Dunagan v. Seely, 533 So.2d 867, 869 (Fla. 1st DCA 1988), holding prison employees' failure to follow prison policies for supervising, classifying and maintaining inmates to be operational, but the prison's making of such policies to be discretionary; and Davis v. Department of Corrections, 460 So.2d 452, 453 (Fla. 1st DCA 1984), holding that decisions regarding the number and placement of supervisory personnel in prison system is discretionary, rev. dismissed, 472 So.2d 1180 (Fla. 1985).
HRS' supervision policies being challenged here are dictated by the Florida Legislature's enactment of the Bill of Rights of Persons Who are Developmentally Disabled, sections 393.13-.14, Florida Statutes. These statutes mandate that care in a residential facility such as Sunland-Marianna shall be in the least restrictive setting, and require adherence to the "normalization principle," which is defined in section 393.063, Florida Statutes:
"Normalization principle" means the principle of letting the client obtain an existence as close to the normal as possible, making available to the client patterns and conditions of everyday life which are as close as possible to the norm and patterns of the mainstream of society.
The Bill of Rights of Persons Who are Developmentally Disabled also generally provides that persons with developmental disabilities shall have all the rights enjoyed by citizens of the State of Florida and the United States, and specifically identifies rights to, inter alia, dignity, privacy, social interaction, and participation in community activities, as well as the right to be free from isolation or unreasonable restraint. § 393.13, Fla. Stat.
In sum, the legislature has mandated that HRS provide "normal" living conditions, to the extent possible, to persons with developmental disabilities within its care. Under this directive, HRS' policy is that residents have social functions on the premises and have contact with friends and visitors. Residents are not confined to the institution at all times. Secure, restrictive, and constant supervision is inconsistent with the normalization policy, and one-on-one supervision of residents at all places and at all times is, practically speaking, unrealistic, if not all but impossible. Yet this is what Lee urges in the present appeal.[7]
*307 The Florida Supreme Court's holding in B.J.M., supra at 914, is particularly persuasive in this context:
Indeed, HRS is one of the primary means by which adult society carries out its implicit obligation to care for those who, by reason of age and unfortunate circumstances, cannot care for themselves and have no one else to care for them. It is also apparent, in our view, that making HRS liable for tort damages for its mistakes in judgment in carrying out this task would considerably impair the exercise of that function. Parents, for instance, are granted almost unlimited discretion in carrying out similar responsibilities. It is the rare case where the State will intervene, and the rarer case still that the State will impose tort liability for parental actions. Similarly, the courts, through tort actions, are ill-suited to second-guess HRS's decisions as to the provision and choice of services each time there is an unsatisfactory outcome. [(Emphasis added).]
The wisdom of the normalization policy, with its attendant benefits and risks, is a discretionary matter involving budgetary and public policy considerations outside the realm of the courts. The Florida Supreme Court in City of Pinellas Park v. Brown, 604 So.2d 1222, 1226 (Fla. 1992), held that governmental acts are discretionary and sovereignly immune if they involve an exercise of executive or legislative powers such that, for the court to intervene by way of tort law, it would inappropriately entangle itself in fundamental questions of policy and planning.
We, therefore, reverse, but certify the following question of great public importance to the Florida Supreme Court:
WHERE A SEVERELY RETARDED RESIDENT OF AN HRS FACILITY BECOMES PREGNANT WHILE IN HRS' CARE, BUT NEITHER THE SPECIFIC CIRCUMSTANCES OF HER IMPREGNATION NOR ANY SPECIFIC ACT OF HRS' NEGLIGENCE IS ALLEGED OR ESTABLISHED AT TRIAL, CAN HRS BE HELD LIABLE IN TORT FOR ALLEGED NEGLIGENT SUPERVISION OF THE RESIDENT, GIVEN THE "NORMALIZATION PRINCIPLE," SECTION[S] 393.13-.14, FLORIDA STATUTES ("THE BILL OF RIGHTS OF PERSONS WHO ARE DEVELOPMENTALLY DISABLED")?
ALLEN and BENTON, JJ., concur.
NOTES
[1] Lee asserted several other counts in her complaint against HRS, but the trial court eventually disposed of these counts through summary judgment, holding, inter alia, that "[t]he policies of HRS which are used to determine the appropriateness for the provision of birth control to its clients is a discretionary function which is protected by sovereign immunity and which does not expose the agency to tort liability." We affirm without discussion Lee's cross-appeal of the summary judgment order.
[2] Lee also asserted that D.L. must have been sexually abused because of her alleged inability to consent to sexual intercourse. The trial court instructed the jury that "[t]he parties to this action have agreed that D.L. suffers from severe profound mental retardation. You must keep this in mind when you consider whether D.L. could intelligently, knowingly, and voluntarily consent to sexual intercourse." HRS contends that this instruction was erroneous, but we need not address this issue due to our resolution of this case on other grounds. See generally Michael L. Perlin, Hospitalized Patients and the Right to Sexual Interaction: Beyond the Last Frontier?, 20 N.Y.U. Rev. L. & Soc. Change 517, 531-34 & 540-45 (1993-94) (discussing the capacity of institutionalized persons to consent to sexual intercourse).
[3] Although not initially raised by the parties as an issue on appeal, sovereign immunity was an issue below and is properly considered here. See Trushin v. State, 425 So.2d 1126, 1129 (Fla. 1982) (once appellate court has jurisdiction it may, if it finds necessary to do so, consider any item that may affect the case); Department of Highway Safety & Motor Vehicles v. Kropff, 491 So.2d 1252, 1254 n. 1 (Fla. 3d DCA 1986) (sovereign immunity relates to subject matter jurisdiction and may be raised at any time).
[4] Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440 (Wash. 1965). The Evangelical Brethren test, as adopted by the Florida Supreme Court in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979), poses four questions: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?
[5] See Cutler v. City of Jacksonville Beach, 489 So.2d 126, 128 (Fla. 1st DCA 1986) (allegation that on-duty lifeguards failed to adequately supervise and monitor area in which decedent drowned were not sufficient, in absence of other allegations of specific fact, to state a cause of action against the city); Kirkland v. Department of Health & Rehab. Servs., 424 So.2d 925, 927 (Fla. 1st DCA 1983) (allegation that hospital negligently supervised mental patient not sufficiently detailed to apply Evangelical Brethren test).
[6] Also distinguishable is Doe v. Escambia County School Board, 599 So.2d 226, 227 (Fla. 1st DCA 1992), since it involved specific allegations and proof that certain teachers negligently breached their duty to supervise students.
[7] A similar contention was urged and rejected in Foy v. Greenblott, 141 Cal. App.3d 1, 190 Cal. Rptr. 84, 90-91 (1st App.Div. 1983), which holds:

Appellants suggest "extra supervision" of the conservatee's contacts with men as one means of insuring she does not conceive. Every institutionalized person is entitled to individualized treatment under the "least restrictive" conditions feasible  the institution should minimize interference with a patient's individual autonomy, including her personal "privacy" and "social interaction." Obviously, effective hospital policing of patients would not only deprive them of the freedom to engage in consensual sexual relations, which they would enjoy outside the institution, but would also compromise the privacy and dignity of all residents. [(Citations and footnote omitted).]