653 So.2d 1091 (1995)
DEPARTMENT OF CORRECTIONS, Appellant/Cross Appellee,
v.
Linda McGHEE, Appellee/Cross Appellant.
No. 93-3757.
District Court of Appeal of Florida, First District.
April 13, 1995.
Robert A. Butterworth, Atty. Gen., Laura Rush, Asst. Atty. Gen., Tallahassee, for appellant/cross appellee.
Jack W. Shaw, Jr. of Osborne, McNatt, Shaw, O'Hara, Brown & Obringer, P.A., Jacksonville, for Florida Defense Lawyers Ass'n, amicus curiae.
Louis K. Rosenbloum and Virginia M. Buchanan of Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, Dawn Wiggins Hare of Hare and Hare, Monroeville, AL, for appellee/cross appellant.
Joel S. Perwin of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, for Academy of Florida Trial Lawyers, amicus curiae.
WOLF, Judge.
The Department of Corrections (DOC) appeals from a final judgment awarding damages in a negligence action in favor of Linda McGhee (appellee). The appellant raises four issues on appeal; appellee filed a cross appeal which raises one issue. As a result of our disposition, it is only necessary for us to rule on two issues raised by appellant: (1) Whether the trial court erred in determining that the law of Florida rather than the law of Mississippi applied in determining whether DOC could be held liable as a result of criminal acts of escaped convicts, and (2) whether the trial court erred in determining that DOC owed a duty to appellee under the circumstances of this case.
We find that the trial court did not err in applying Florida law in determining whether the Florida DOC could be held liable as a *1092 result of alleged negligence occurring in Florida. We do find, however, that no common law or statutory duty existed in favor of appellee or her deceased husband, and reverse the final judgment. We also certify the same question which was certified in State of Florida, Dep't of Corrections v. Vann, 650 So.2d 658 (Fla. 1st DCA 1995), as being one of great public importance.
John Fred Woolard and Dempsey Alexander Bruner escaped from the custody of DOC while being taken to the doctor for an eye examination. The escapees fled from Florida to Alabama and ultimately to Mississippi where they were responsible for the shooting of appellee's husband, a park ranger. Appellee filed suit against DOC, alleging that the agency was negligent in its care, supervision, and control of Woolard and Bruner, and that as a result of such negligence, the inmates escaped on May 24, 1990, and thereafter caused the death of Robert McGhee, Jr., her husband, on May 26, 1990. DOC moved to dismiss the complaint on the grounds that the law of Mississippi rather than Florida should determine the rights and liabilities of the parties, and that Mississippi law did not recognize liability under these circumstances. Following the submission of written memoranda of law by the parties and a hearing, the trial court denied the motion on a finding that Florida had the most significant relationship with the events and occurrences surrounding the claim. Prior to trial, the parties submitted written memoranda of law pertaining to the issue of whether DOC owed a duty of care to the decedent. At the close of McGhee's case, DOC moved for a directed verdict on grounds that DOC did not owe a duty of care to the decedent as a matter of law, relying on arguments set forth in its memorandum of law. The court denied the motion. DOC's timely motion for a new trial on the same grounds was also denied. The jury returned a verdict in favor of appellee.
Mississippi, like Florida, follows the "significant relationships" or "center of gravity" test from the Restatement (Second) of Conflict of Laws § 145, et seq. (1971), for choice of law decisions in tort cases. The focus of the significant contacts analysis is as to the particular issue which is to be decided rather than the case as a whole.
Section 146 of the Restatement provides:
In an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
Restatement (Second) of Conflict of Laws § 146 (1971) (emphasis added). Following the Restatement's mandate, the Mississippi Supreme Court has specifically ruled that the center of gravity test followed in that state may require application of the law of different jurisdictions to different issues within the same case:
First, the law of a single state does not necessarily control every issue in a given case. We apply the center of gravity test to each question presented, recognizing that the answer produced in some instances may be that the law of this state applies and on other questions in the same case the substantive law of another state may be enforceable.
Boardman v. United Services Automobile Ass'n, 470 So.2d 1024, 1031 (Miss. 1985). See also Hanley v. Forester, 903 F.2d 1030, 1032 (5th Cir.1990) (Mississippi "center of contacts test may be applied in piecemeal fashion such that in a single case, the law of one state may be applied to one issue in the case while the law of another state may apply to another issue in the case depending upon which state has the most significant contacts with respect to each particular issue.")
Florida follows the same rule applicable in Mississippi. In Stallworth v. Hospitality Rentals, Inc., 515 So.2d 413 (Fla. 1st DCA 1987), following section 146 of the Restatement, this court stated,
The Restatement's significant relationships test does not require the court to evaluate the recited contacts with a view to determine which state's local law should be applied to all issues in the case as a whole; rather, the contacts must be evaluated *1093 with respect to the particular issue under consideration.

Stallworth at 413 (emphasis added).
DOC's emphasis upon the situs of the injury, Mississippi, is misplaced because the location of the injury is unrelated to the issues of sovereign immunity and duty. DOC's immunity was determined by deciding whether its conduct in allowing the inmates to escape could result in liability for the criminal conduct of the escapee. All facts relevant to the issue of immunity and duty were centered in the state of Florida, and the state of Mississippi had no relationship to any of DOC's activities giving rise to its potential liability.
The determination of whether a state agency may be held liable for its conduct within the state of Florida is properly determined pursuant to Florida law.
While we have no problem with the trial court's decision to apply Florida law, we do find that it was error to find that DOC could be held liable for the criminal conduct of escapees. The trial court did not have the benefit of this court's recent decision in Vann, supra, at the time it was faced with this issue. We find that Vann is controlling, and that under the rationale stated in the opinion, DOC could not be held liable under these circumstances. We, therefore, reverse the final judgment and direct the trial court to enter a final judgment in favor of appellant. As in Vann, however, we certify the following question to be one of great public importance:
WHETHER THE DEPARTMENT OF CORRECTIONS MAY BE HELD LIABLE AS A RESULT OF THE CRIMINAL ACTS OF AN ESCAPED PRISONER?
MINER, J., concurs.
ERVIN, J., concurs and dissents with written opinion.
ERVIN, Judge, concurring and dissenting.
I concur with the majority in affirming the trial court's denial of appellant's motion to dismiss for the reason that the law of Florida rather than the law of Mississippi was correctly applied in determining that the Department of Corrections (Department or DOC) could be held liable as a result of the escaped convicts' criminal acts. I dissent from that portion of the majority's decision reversing the denial of appellant's motion for directed verdict on the ground that the DOC owed no duty to appellee's decedent, for the reasons set out under part one of this opinion, but I concur with the majority in certifying a question to the Florida Supreme Court. I would also affirm the remaining issues appellant raised. Because the majority has reversed as to the above point, its consideration of the issue submitted in appellee's cross-appeal was rendered moot. Since I dissent from the reversal of the denial of the motion for directed verdict, I will also address the issue presented in the cross-appeal under the second portion of this opinion, and I would affirm as to it.

I.
I cannot agree with the majority that no common law duty exists in favor of appellee or her deceased husband under the circumstances involved in this case. In so concluding, I note that the majority relies upon a recent opinion of this court in Department of Corrections v. Vann, 650 So.2d 658 (Fla. 1st DCA 1995), wherein it was similarly held that the Department owed no common law duty to a decedent, the victim of a criminal act committed by an escaped inmate. I acknowledge that the decisions in the case at bar and Vann are consistent with those in Parker v. Murphy, 510 So.2d 990 (Fla. 1st DCA 1987); George v. Hitek Community Control Corp., 639 So.2d 661 (Fla. 4th DCA 1994); and Bradford v. Metropolitan Dade County, 522 So.2d 96 (Fla. 3d DCA 1988). I am convinced, however, that these holdings are inconsistent with Florida's waiver of sovereign immunity statute, section 768.28, Florida Statutes (1989), as well as certain general rules of law enunciated by the Florida Supreme Court in Trianon Park Condominium Ass'n v. City of Hialeah, 468 So.2d 912 (Fla. 1985), and Kaisner v. Kolb, 543 So.2d 732 (Fla. 1989).
Because section 768.28(5) imposes liability upon government entities "for tort claims in *1094 the same manner and to the same extent as a private individual under like circumstances," the Department may, under appropriate conditions, be subject to an underlying common law duty to exercise reasonable care to control an inmate or inmates the Department knows or should know would be likely to cause bodily harm to others if not properly controlled by it. In reaching this conclusion, I think it necessary to restate basic principles applicable to the issue. In Trianon Park, the supreme court emphasized that section 768.28 did not, per se, create any new cause of action in tort but merely eliminated the immunity which had previously prevented recovery for existing common law torts committed by the government. Trianon Park, 468 So.2d at 914. In order for there to be governmental tort liability, there must be either an underlying common law or statutory duty of care in regard to the alleged negligent conduct. Id. at 917. The duty issue is entirely separate from the question of whether the complained-of activity is barred by governmental immunity, i.e., a discretionary rather than operational function, as analyzed in Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). See also Kaisner v. Kolb, 543 So.2d 732 (Fla. 1989) (a court is required to find no liability as a matter of law if either (1) no duty of care arose, or (2) the doctrine of governmental immunity bars the claim).
Thus, the preferred analysis is to decide first whether a duty of care is owed. If not, the court is not obligated to determine whether the challenged act is a discretionary or operational-level activity. I consider that the only substantial question before us for resolution is whether a common law duty could be imposed upon a private person under circumstances similar to those at bar.[1] Because I believe a common law duty of care does exist, I am convinced that the DOC was properly held liable. Moreover, I feel confident that the bar of governmental immunity is inapplicable, because the facts clearly show, as discussed infra, that the DOC's conduct was operational.
Turning to the element of duty, the court in Trianon noted "the general common law rule that there is no duty to prevent the misconduct of a third person," referring to the Restatement (Second) of Torts § 315 (1964), which provides:
"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection."
Trianon, 468 So.2d at 917 n. 2.
Comment c. to section 315 refers the reader to sections 314A and 320 in regard to clause (b). Restatement (Second) of Torts § 315, at 123 (1965) (hereinafter "Restatement"). The supreme court explicitly recognized section 320, involving the duty of a person having custody of another to control the conduct of third persons, in subjecting HRS to liability for failing to take adequate measures to protect a juvenile placed in its care from a sexual assault by fellow detainees housed in the same holding cell. See Department of Health & Rehab. Servs. v. Whaley, 574 So.2d 100, 103 & n. 2 (Fla. 1991). The court earlier acknowledged the existence of such a duty in Everton v. Willard, 468 So.2d 936, 938 (Fla. 1985): "[I]f a special relationship exists between an individual and a governmental entity, there could be a duty of care owed to the individual."
Unlike the duty a public custodian owes to a person placed in its care, described under clause (b) of section 315, the supreme court has not explicitly held that a governmental entity owes a duty to a person injured by the intentional acts of a third person with whom the agency has a special relationship, as provided in clause (a). Nevertheless, such duty clearly exists at common law in actions involving private individuals, as section 315 and the comments appended thereto demonstrate.
*1095 Florida jurisprudence has, moreover, in a number of cases involving private parties, specifically adopted the exception recognized under clause (a) to the general common law rule barring a duty of one to prevent the criminal acts of another or to warn those placed in danger by such acts when a special relationship exists between the defendant and the person whose behavior needs to be controlled. Nova Univ., Inc. v. Wagner, 491 So.2d 1116 (Fla. 1986); Palmer v. Shearson Lehman Hutton, Inc., 622 So.2d 1085 (Fla. 1st DCA 1993); Boynton v. Burglass, 590 So.2d 446 (Fla. 3d DCA 1991); Garrison Retirement Home Corp. v. Hancock, 484 So.2d 1257 (Fla. 4th DCA 1985). Additionally, Comment c. to clause (a) of section 315 refers the reader to sections 316 through 319 of the Restatement,[2] and the Florida Supreme Court has specifically applied section 319 in a case involving an action for damages between private parties.
In Nova University, Inc. v. Wagner, 491 So.2d 1116 (Fla. 1986), the supreme court held that the university, operating a residential rehabilitation program which accepted delinquent, emotionally disturbed and/or ungovernable children as residents, had a duty to exercise reasonable care in its operation to avoid harm to the general public. There, two juvenile residents who had exhibited a propensity toward physical violence, of which the defendants were aware or should have been aware, ran away from the center and the following day encountered two small children, one of whom they killed and the other permanently injured. The complaint alleged that the defendants were negligent in failing to supervise and control the two delinquents assigned to their custody. In approving the Fourth District's decision reversing the trial court's summary judgment in favor of the university, the court relied upon the principle of law provided in section 319[3] of the Restatement and concluded "that a facility in the business of taking charge of persons likely to harm others has an ordinary duty to exercise reasonable care in its operation to avoid foreseeable attacks by its charges upon third persons." Nova Univ., 491 So.2d at 1118. I think it clear that the special relation described in section 319 applies to the relationship between the DOC and the escapees in this case, thus DOC's duty of care is encompassed by section 315(a) of the Restatement.
In her complaint filed against the DOC, McGhee alleged that before the escape, the defendant knew or should have known that the two inmates placed in its care would commit violent crimes of the kind committed on the plaintiff's decedent, because they had been convicted of violent felonies before they were committed to DOC's custody. She further alleged that the Department, through its agents and employees, was negligent in allowing the inmates to escape during their transfer from the Holmes Correctional Institution to a doctor's office in Bonifay, Florida, for an eye examination, by, among other things, failing to provide adequate secure detention for them, failing to provide adequate security while moving the prisoners, failing to adequately search the inmates for weapons, and failing to have the inmates properly restrained to prevent their escape.[4]
*1096 I have found nothing in any Florida Supreme Court opinion which supports the majority's conclusion that a governmental entity owes no common law duty of care to individual members of the public to protect them from injuries perpetrated by escapees. A supreme court opinion presenting the most analogous factual situation to that at bar is Reddish v. Smith, 468 So.2d 929 (Fla. 1985). In that case, the court held that because the theory of liability expressed in plaintiff's complaint was that the DOC, in reclassifying an inmate's institutional status from "medium custody" to "minimum custody," had failed to conform to the proper standard of care required in classifying and assigning the custody of prisoners, its conduct was immune from liability to a victim of the escaped prisoner's criminal acts, as it involved simply a planning-level function which was an inherent feature of an essential governmental role assigned to the Department. Cf. Everton v. Willard, 468 So.2d 936, 939 (Fla. 1985) (law enforcement officer's decision of whether to arrest an individual for an offense is a basic discretionary, judgmental decision which is inherent in enforcing the laws of the state and is therefore immune from liability). In so holding, the court proceeded directly to the second prong of the analysis the court approved in Trianon, i.e., the issue of governmental immunity, but never reached the question of whether any duty of care existed.
By focusing on the discretionary nature of inmate classification, it is possible that the court in Reddish considered that a duty arose because of the special relation between the DOC and the inmate. Indeed, the following statement in the opinion suggests that a cause of action might have been stated if the plaintiff had pled a different theory of liability: "The complaint in this case was based on the classification and assignment of Prince [the inmate] and not on the possible negligence of the department's employees having a direct and operational-level duty to supervise him and keep him confined at the time of his escape." Reddish, 468 So.2d at 931-32. Clearly, then, Reddish provides no authority for concluding that the Department can never owe a common law duty to one injured by the intentional, tortious acts of an escapee who had been placed in the DOC's custody.
In the case which the majority cites to support its conclusion that the state cannot be held liable for injuries stemming from the criminal acts of its escapees, Department of Corrections v. Vann, the court quotes the following excerpt from Department of Health & Rehabilitative Services v. Whaley, 574 So.2d at 102-03 n. 1: "`[T]he Department of Corrections has no specific duty to protect individual members of the public from escaped inmates.'" Vann, 650 So.2d at 661. A complete reading of the above footnote in Whaley shows, however, that the supreme court was not confronted with the issue of whether a common law duty of care could arise. Rather, the certified question before the court in Whaley was whether the assignment of juvenile delinquents to an HRS detention facility was an inherently governmental function protected by sovereign immunity, a question the court answered in the negative. In arguing that the assignment constituted a discretionary act for which sovereign immunity had not been waived, HRS relied on, among other cases, Reddish v. Smith. In rejecting this argument, the court in Whaley distinguished the facts in Reddish from those before it and made the following pertinent observations:
Moreover, Reddish is further distinguished because the department of corrections has no specific duty to protect individual members of the public from escaped inmates while HRS has specific statutorily imposed duties to protect children. See Yamuni [Department of Health & Rehabilitative Services v. Yamuni, 529 So.2d 258 (Fla. 1988)]. HRS' statutory duties toward children are, ultimately, the main difference between this case and prisoner cases *1097 such as Reddish ... and we decide this case solely on HRS' duty, not the duty of any other governmental agency.
Whaley, 574 So.2d at 103 n. 1.
Consequently, I maintain that the quoted portion from Whaley, referred to in Vann, means simply that a statutory duty was imposed upon HRS for the protection of children transferred to its care,[5] whereas no such duty was placed on the DOC by statute for the protection of members of the public from escaped prisoners.[6] Nothing in Whaley addresses the question of whether an underlying common law duty of protection may arise in favor of members of the general public once a special relationship has been established between a state agency and a person entrusted to its charge whom the agency knows to be likely to cause bodily harm to others if not properly controlled.
Although I have found no Florida Supreme Court opinions directly supporting the majority's decision that DOC is not under a duty to exercise reasonable care to control the conduct of an inmate in order to prevent him or her from doing harm to another, I admit that authority for same is furnished in the three district courts of appeal cases cited in Vann: Parker v. Murphy, 510 So.2d 990 (Fla. 1st DCA 1987); George v. Hitek Community Control Corp., 639 So.2d 661 (Fla. 4th DCA 1994); and Bradford v. Metropolitan Dade County, 522 So.2d 96 (Fla. 3d DCA 1988), all involving victims of attacks by escapees from custodial restraints placed on them by various governmental entities. Unlike appellee, I am unable to distinguish the facts in the above cases from those at bar in order to reach a different result. My position is simply that all three were incorrectly decided as a matter of law. Although these opinions emphasize the lack of a special relationship between the person injured and the particular governmental entity, none address the question of whether, because of the existence of a special relationship between a custodian and the person placed in confinement as described in Restatement section 315(a), the caretaker could owe a duty to individual members of the general public injured by the person in its control as a reasonable consequence of its negligent failure to monitor such person's conduct. Thus, the above three cases ignore or overlook the special relationship recognized under section 315(a), apparently because the Florida Supreme Court has not yet specifically acknowledged its applicability in any of its opinions involving negligent actions brought against public agencies, and the confusion spawned by this omission continues to plague appellate court decisions.[7]
*1098 I am therefore of the view that because of the special relation between the DOC and the two inmates placed in its custody, a duty of care was owed to appellee's deceased husband to the same extent as it exists at common law between private persons. Liability was therefore correctly imposed upon the DOC as a result of the criminal acts of the escapees, persons whom the DOC knew to be likely to cause bodily harm to others if it did not exercise reasonable care to control them from doing such harm.
As a result of the confusion previously alluded to, I concur with the majority in certifying to the Florida Supreme Court a question of great public importance. I think, however, the question should be more narrowly tailored to the facts and law before us to ask:
WHETHER THE DEPARTMENT OF CORRECTIONS, WHICH IS IN THE BUSINESS OF TAKING CHARGE OF PERSONS WHOM IT KNOWS TO BE LIKELY TO CAUSE BODILY HARM TO OTHERS IF NOT CONTROLLED BY IT, IS UNDER A DUTY TO EXERCISE REASONABLE CARE TO CONTROL SUCH PERSONS TO PREVENT THEM FROM DOING SUCH HARM?
In concluding that a common law duty is present under the circumstances, I think it important to note that the DOC advanced an argument based on a different theory from that addressed by the majority in its decision to reverse. Indeed, the Department makes the following pertinent concession: "Had inmates Bruner and Woolard shot an individual in Bonifay at the time they escaped from DOC custody or within the parameters of DOC's search and recapture efforts immediately after the escape, there would be no question as to whether that individual was owed a duty of care by DOC." (Appellant's reply brief at 12.) The thrust of the Department's argument is that it owed no duty, because it was not foreseeable that the harm which was in fact suffered would ensue from the inmates' escape, and it noted that Restatement section 319, while imposing a duty of care upon those taking charge of dangerous persons, does not define the scope and extent of such duty.
In support of this argument, the DOC cites McCain v. Florida Power Corp., 593 So.2d 500, 502 (Fla. 1992), which states: "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader `zone of risk' that poses a general threat of harm to others." The court continued that each defendant who creates a risk is required to exercise prudence whenever others might conceivably be injured as a result of the defendant's breach of such risk. It concluded its discussion with the following admonition: "[T]he trial and appellate courts cannot find a lack of duty if a foreseeable zone of risk more likely than not is created by the defendant." Id. at 503.
It is appellant's position that any negligence the DOC committed in permitting the two inmates to escape from its custody did not create a foreseeable zone of risk which encompassed the victim, because the facts disclose that the victim's injuries were suffered more than 300 miles from the place of escape, across two state lines and 46 hours following the escape. Thus, the Department contends that the facts at bar are determinative regarding whether it was foreseeable that DOC's negligent conduct would create a zone of risk which posed a general threat of harm to others. See McCain, 593 So.2d at 503 n. 2 (citing Restatement (Second) of Torts § 285 (1965)).
In its discussion of why the facts demonstrate the lack of any foreseeable risk, the DOC cites Wilson v. Department of Public Safety & Corrections, 576 So.2d 490 (La. 1991), a case which provides a more specific test than McCain for determining whether a victim of an escaped prisoner's criminal acts comes within the zone of risks that can be considered a reasonably foreseeable consequence resulting from a custodian's negligent act. The test there adopted, however, provides little assistance to appellant's cause. The court stated:
In resolving the scope of the duty issue, improper emphasis has occasionally been placed ... on the proximity of time and distance between the escape and the escapee's offense that caused the injury to his victim. The proper question is whether *1099 the offense occurred during, or as an integral part of, the process of escaping.

Wilson, 576 So.2d at 493. In so deciding, the court noted that the operative word in the analysis is "process," because "there is no bright-line point of delineation which will satisfactorily assist a court in making the appropriate duty-risk analysis." Id. at 494. It concluded that the time and distance from the escape to the time and place of injury were but two factors among many which should be considered in determining whether the acts for which the plaintiff sought compensation were committed during, or as an integral part of, the process of escaping. Id.
In applying the above test to the instant case, it appears that the injuries suffered by appellee's decedent transpired during an integral part of the inmates' process of escape, as the facts disclose that they occurred at a time while the two escapees were continuing their flight from custody. Because I conclude, after applying the test approved in McCain, that the DOC's negligence more likely than not created a foreseeable zone of risk that included the harm suffered by the victim, I would affirm as to the second issue raised by the DOC.[8]

II.
Appellee urges as a point of reversal in her cross-appeal that the trial court erred in permitting the jury to apportion noneconomic damages between negligent and intentional tortfeasors,[9] and, in so doing, it misconstrued the intent of the legislature in enacting section 768.81(3), Florida Statutes (1989), a portion of the comparative fault statute. As to this issue, I would also affirm.
In allowing apportionment of damages, the trial court proceeded according to the provisions of section 768.81(3), which provides:
(3) APPORTIONMENT OF DAMAGES.  In cases to which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability; provided that with respect to any party whose percentage of fault equals or exceeds that of a particular claimant, the court shall enter judgment with respect to economic damages against that party on the basis of the doctrine of joint and several liability.
(Emphasis added.)
Although McGhee concedes that no Florida decision has as yet decided whether the above subsection authorizes apportionment of fault between both negligent and intentional defendants in the same action, she relies upon section 768.81(4) as an indication that the legislature intended to exclude intentional tortfeasors from the ambit of the comparative fault statute. Section 768.81(4)(a) and (b) explain:
(a) This section applies to negligence cases[,] .. . [which] includes ... civil actions for damages based upon theories of negligence, strict liability, products liability, professional malpractice whether couched in terms of contract or tort, or breach of warranty and like theories. In determining whether a case falls within the term "negligence cases," the court shall look to the substance of the action and not the conclusory terms used by the parties.
(b) The section does not apply to any action brought by any person to recover actual economic damages resulting from *1100 pollution, to any action based upon an intentional tort, or to any cause of action as to which application of the doctrine of joint and several liability is specifically provided by chapter 403, chapter 498, chapter 517, chapter 542, or chapter 895.
(Emphasis added.) (Footnotes omitted.)
The DOC argued successfully before the trial court that the two inmates, who were not named parties to the action, were partially at fault based upon their intentional, criminal conduct; therefore, the jury should consider the percentages of fault of all tortfeasors in reaching its verdict on damages. Due to the non-negligent nature of the inmates' acts, McGhee now contends that DOC's claim for apportionment must be barred by the provisions of section 768.81(4)(b), excluding from its operation any action based upon an intentional tort.
McGhee argues that her interpretation of the statute is consistent with the common law rule preventing a defendant from raising the defense of contributory negligence once such defendant has been found liable because of his or her intentional conduct. McGhee admits that she did not charge the DOC with an intentional tort in her complaint, but contends that the earlier cases show that fault based on negligence cannot be compared with fault grounded on intentional conduct. It follows, under her theory, that it is not fair to allocate responsibility among negligent and intentional tortfeasors, because their conduct is governed by different legal standards.
McGhee concludes that the comparative fault statute is in derogation of common law, thus should be strictly construed. In support of her argument, she cites Kansas State Bank & Trust Co. v. Specialized Transportation Services, Inc., 249 Kan. 348, 819 P.2d 587 (1991), wherein an action was brought on behalf of a mentally retarded child against a school bus driver, school bus transportation service, and school district for the bus driver's molestation of the child. On appeal, the transportation service and school district argued that the trial court erred by refusing to allow the jury to compare the fault of the intentional tortfeasor (the bus driver) with their own fault, which was based on negligence. The court affirmed, reasoning that intentional acts of third parties cannot be compared with the negligent acts of a defendant whose duty it is to protect the plaintiff from the intentional acts committed by the third party. Id. at 606. Accord Bach v. Florida R/S, Inc., 838 F. Supp. 559 (M.D. Fla. 1993); Doe v. Pizza Hut of Am., Inc., No. 93-709 (M.D.Fla. June 21, 1994).
The Academy of Florida Trial Lawyers joins McGhee in urging reversal, contending that section 768.81 only abrogates joint and several liability to the extent it would otherwise apply under common law. It explains that under the common law, joint and several liability was only imposed against joint tortfeasors, defined as parties whose negligence combined to produce the plaintiff's injury. Thus, a defendant could not reduce his or her liability by pointing to wrongdoing (negligent or intentional) which occurred in a separate transaction, and he or she could not seek contribution except from a joint tortfeasor. See § 768.31(2)(a) & (c), Fla. Stat. (1989). Consequently, it is the Academy's position that because section 768.81 allows apportionment in cases involving joint tortfeasors, but says nothing about non-joint tortfeasors, it does not alter the common law rule prohibiting contribution among non-joint tortfeasors.
The Florida Defense Lawyers Association has filed an amicus brief in this appeal urging affirmance of the trial court's action, and it distinguishes Kansas State Bank & Trust, because the statute there was worded in terms of a party's negligence, and not, as in Florida, in terms of a party's fault. Moreover, it cites contrary authority allowing a negligent defendant to apportion liability with an intentional tortfeasor. See Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991). The Association explains that while an intentional tortfeasor could not seek contribution from a negligent tortfeasor, the latter could seek contribution from an intentional tortfeasor. It also refers to case law indicating that although a third party's conduct may be intentional, such fact does not preclude the application of comparative negligence between the negligent parties. See Island City Flying Serv. v. General Elec. Credit Corp., 585 So.2d 274 (Fla. 1991) (in aircraft owner's *1101 suit against flying service for negligent hiring or retention of employee who stole and crashed owner's plane, flying service was entitled to comparative negligence defense against owner who failed to lock plane, despite employee/thief's intentional tort).
After considering the arguments by counsel and the authorities cited, I would affirm as to this issue. It is clear that plaintiff's action against the DOC was based on negligence, and the comparative fault statute specifically applies to actions for negligence. § 768.81(4), Fla. Stat. (1989). No action was brought by appellee on the theory of intentional tort. In reaching my conclusion, I am greatly persuaded by the cogent analysis of the Supreme Court of New Jersey in Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991), which appears to be in harmony with the spirit of Florida's comparative negligence law. In Blazovic, the court explained that early cases had distinguished between negligent and intentional conduct in order to circumvent the harsh effect of the contributory-negligence bar, under the view that intentional tortfeasors should be required to pay damages as a means of deterring them from future wrongdoing, regardless of whether a plaintiff had been partially negligent. Additionally, under common law, joint tortfeasors could not seek contribution from each other. With the passage of contribution law, joint tortfeasors could recover their pro rata share of the judgment from the other joint tortfeasors, thereby limiting their liability. Intentional tortfeasors could not seek contribution, however, and such prohibition was intended to deter future wrongdoing;[10] the same theory advanced vis-a-vis a plaintiff and an intentional tortfeasor. Id. at 228-29.
With the advent of comparative negligence, the all-or-nothing result of contributory negligence was eliminated and recovery was allowed based on a percentage of the parties' negligence. Moreover, under the comparative fault statute, joint tortfeasors were no longer liable for a pro rata share, but were liable in proportion to their percentage of fault. In the court's view, the application of the law in such manner results in greater fairness to both moderately negligent plaintiffs, as well as joint tortfeasors. Id. at 230.
The court further observed that some courts had refused to apportion negligence to intentional tortfeasors, but it was unpersuaded by those cases. It found the more just result was to allow comparative negligence as to both negligent and intentional tortfeasors, because it distributes the loss according to the respective faults of the parties causing the loss. Id. at 231.
The reasoning of the court's opinion in Blazovic appears to me to be consistent with the Florida courts' general interpretations of section 768.81 in that the statute clearly requires a jury's consideration of each individual's fault contributing to an injured person's damages, even if such person is not or cannot be a party to the lawsuit. See Fabre v. Marin, 623 So.2d 1182 (Fla. 1993); Allied-Signal, Inc. v. Fox, 623 So.2d 1180 (Fla. 1993). As observed in Marin: "Clearly, the only means of determining a party's percentage of fault is to compare that party's percentage to all of the other entities who contributed to the accident, regardless of whether they have been or could have been joined as defendants." 623 So.2d at 1185.
I consider that the comparative fault statute, in precluding the comparing of fault in any action based upon intentional fault, expressed an intent to retain the common law rule forbidding an intentional tortfeasor from reducing his or her liability by the partial negligence of the plaintiff in an action based on intentional tort. However, such exclusion has no applicability to an action, such as that at bar, based solely on negligence, and, consequently, the fault of both negligent and intentional tortfeasors may appropriately be apportioned as a means of fairly distributing the loss according to the percentage of fault of each party contributing to the loss. I would therefore affirm as to this issue.
NOTES
[1] The Department owes no statutory duty of care to a person injured by the violent acts of an escaped inmate. Department of Health & Rehab. Servs. v. Whaley, 574 So.2d 100, 102-03 n. 1 (Fla. 1991); George v. Hitek Community Control Corp., 639 So.2d 661, 663 (Fla. 4th DCA 1994).
[2] The special relations listed in clause (a) are parent-child, master-servant, possessor of land, and custodian of a person with dangerous propensities. As observed in Garrison Retirement Home Corp. v. Hancock, 484 So.2d 1257, 1261 (Fla. 4th DCA 1985): "Implicit in the special relationship exception [under clause (a)], however, is the proposition that such special relationship must include the right or the ability to control another's conduct."
[3] This section, involving the duty of those in charge of persons having dangerous propensities, provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement § 319. An example provided in the Illustrations to section 319 is similar to the factual pattern in Nova University and the case at bar: "A operates a private sanitarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and causes harm to C. A is subject to liability to C." Id. at 130.
[4] The facts alleged and the evidence presented in the instant case show obvious operational-level activity which is not barred by governmental immunity in that the failure of the guards to properly supervise the inmates placed in their custody can hardly be considered a discretionary function of the government which is inherent in the act of governing. See Trianon, 468 So.2d at 918. The conduct of the DOC, moreover, is similar to the nonexclusive examples the supreme court listed in Trianon as indicative of existing common law duties of care: the negligent operation of motor vehicles or the handling of firearms by public employees during the course of their employment for the purpose of enforcing compliance with the law. Id. at 920. Indeed, before the trial of the case, the DOC admitted that it was negligent in allowing the two prisoners to escape, but that it owed no duty to the victim because his injuries were not a foreseeable consequence of DOC's admitted negligence.
[5] Why the court considered it necessary to emphasize the existence of a statutory duty as a distinguishing factor is unclear in that the court otherwise mentioned that one who takes a person into custody owes such person a common law duty of care, and in support thereof the court referred to Restatement (Second) of Torts § 320 (1965), pertaining to the duty of a person having custody of another to control the conduct of third persons. Consequently, as a common law duty of care exists under such circumstances, the portion of the opinion discussing the imposition of a statutory duty appears nonessential to the court's decision.
[6] Although no statutory duty exists, clearly DOC has the statutory right of control over inmates placed in its custody, which gives rise to the special relationship discussed under Restatement section 315(a). Section 945.04(1), Florida Statutes (1989), makes DOC "responsible for the inmates and for the operation of, and shall have supervisory and protective care, custody, and control of, all ... matters connected with, the correctional system."
[7] An additional reason for such confusion is the tendency of some of the district courts to read certain portions of the supreme court's opinions in isolation and out of context. For example, in George v. Hitek Community Control Corp. the court relied upon the following quoted material as support for its conclusion that governmental responsibility to manage persons under criminal sentences flows from the state's inherent police power to enforce the laws, and, therefore, the challenged activity could not give rise to a duty of care: "`How a governmental entity, through its officials and employees, exercises its discretionary power to enforce compliance with the laws duly enacted by a governmental body is a matter of governance, for which there has never been a common law duty of care.'" George, 639 So.2d at 663 (quoting Trianon Park, 468 So.2d at 919). See also the following statement in Everton v. Willard, 468 So.2d 936, 938 (Fla. 1985): "The victim of a criminal offense, which might have been prevented through reasonable law enforcement action, does not establish a common law duty of care to the individual citizen and resulting tort liability, absent a special duty to the victim."
[8] I would also affirm all of DOC's remaining issues. The third point urges reversal on the ground that the trial court erred in allowing an expert witness to opine that the injuries the victim suffered were a reasonably foreseeable consequence of the DOC's negligence in permitting the inmates to escape. Although I agree with the DOC that the court erred in permitting the testimony, because the opinion had the effect of applying a legal standard to a set of facts, I think the error was harmless considering the totality of other evidence supporting the verdict. Cf. Tallahassee Memorial Regional Medical Ctr. v. Meeks, 560 So.2d 778 (Fla. 1990). As to the final issue, that the lower court erred in refusing to give a requested special jury instruction defining the term "reasonably foreseeable," I agree with appellee that Florida Standard Jury Instruction 5.1(c) adequately covered the request. Cf. Reeder v. Edward M. Chadbourne, Inc., 338 So.2d 271 (Fla. 1st DCA 1976).
[9] The jury allocated 50 percent of the fault to the Department and 25 percent to each of the two inmates.
[10] The common law rule has also been retained in Florida's Contribution Among Joint Tortfeasors statute. Although section 768.31(2)(a) and (3) permits two or more persons jointly or severally liable to seek contribution among them based on their relative degrees of fault, contribution is denied intentional tortfeasors. § 768.31(2)(c), Fla. Stat. (1989).