ON MOTION FOR REHEARING

WARNER, C.J.
We withdraw our previously issued opinion and substitute the following in its place.
In this medical malpractice action, involving delivery of the appellee Cindy Ewing’s child, the trial court denied the appellant Dr. Louis Anderson’s motion for judgment in accordance with his motion for directed verdict. The doctor appeals, contending that the Ewings failed to prove the doctor’s negligence and that some evidence of damages was inadmissible hearsay. The Ewings appeal the trial court’s order setting off the infant child’s settlement with another defendant, from Mr. and Mrs. Ewing’s award of damages. They also appeal the trial court’s refusal to enter a judgment of the entire verdict amount against Dr. Anderson after the court directed a post-trial verdict in favor of another defendant doctor whom the jury had found to be comparatively at fault with Anderson. We affirm the order denying Dr. Anderson’s motion for judgment in accordance with his motion for directed verdict, concluding that there was sufficient evidence to submit the issues to the jury, and we affirm the trial court’s set-off of the settlement allocated to the child against the damages due to Mr. and Mrs. Ewing, based on Dionese v. City of West Palm Beach, 500 So.2d 1347 (Fla. *1163 1987). We reverse, however, the refusal to enter the entire remaining judgment against the appellant.
This case is a companion case with Ewing v. Sellinger, 758 So.2d 1196 (Fla. 4th DCA 2000), and involves Cindy Ewing’s delivery of her child. To provide for her prenatal care and delivery, Ewing contracted with Care Delivery, Inc., a nurse-midwife clinic. Drs. Anderson and Louis Sellinger, both obstetricians, contracted with the clinic to assist with its patients. Dr. Anderson’s duties were limited to attending to Care Delivery’s patients when problems arose during delivery.
When Ms. Ewing surpassed her due date, she was seen by Dr. Sellinger, who directed that she be induced into labor. Following the doctor’s advice, Ewing checked into St. Mary’s Hospital the next day for induced vaginal labor, using a pito-cin drip to start contractions. No directions were given by Dr. Sellinger that Ewing he attended by a doctor during the induction, and Ewing’s induction, labor, and delivery were handled by the midwives.
Although Dr. Anderson arrived for his routine nightly duties at 6 p.m. on the day Ewing was admitted to the hospital, the nurse-midwives attending Ewing did not report any problems in the induction that would have required Dr. Anderson to examine Ewing. Around that time, Ewing had gone into the final stage of labor. After trying to push and deliver the child for two hours, one of the nurses finally informed Dr. Anderson that they needed his help with Ewing’s delivery. The doctor entered the delivery room around 8:15 to 8:30 p.m. and observed that the baby’s head was delivered, but his shoulders had become lodged behind the pubic bone due to his large size. Dr. Anderson decided to extend the episiotomy to the fourth degree, cutting through Ewing’s rectal sphincter muscle up to her rectum in order to deliver the rest of the baby.
After delivery, Anderson repaired the episiotomy. Despite the surgery, Ewing suffered permanent fecal incontinence. Additionally, the child was born cyanotic and allegedly suffered permanent damage as a result of being deprived of oxygen. Following the incident, the Ewings filed this suit, alleging that Anderson was negligent in failing to examine Ewing when he arrived on duty and in failing to perform a caesarean section when he discovered her problems in delivery. According to the Ewings, such action would have avoided both the child’s distress and the necessity of an- episiotomy.
Ewing’s case against Dr. Anderson revolved around expert testimony that he should have examined Mrs. Ewing as soon as he came on duty. Had he done so, he would have realized that the delivery was not going well based on the fetal monitoring strips, and he would have performed a caesarean section, avoiding the episiotomy. Ewing also claims that Anderson’s repair of the episiotomy was negligent, yet no expert testified at trial that there was evidence of a negligent repair.
We conclude that the evidence was sufficient to withstand a directed verdict. While Anderson concentrates his appellate attack on the repair of the episiotomy, he neglects to challenge the evidence presented that had he examined Ewing when he arrived at the hospital, as the experts said he should have, he would have noticed fetal distress in the monitoring strips. According to the experts, given the condition of the fetus and Ewing’s prolonged labor, coupled with other indicia that the baby may be macrosomatic, Anderson should have performed a caesarean section, thereby avoiding the episiotomy. On the arguments and evidence presented, we affirm the denial of the directed verdict.
Anderson also challenges the damages award, claiming that the trial court should have granted a remittitur because the evidence of the cost of future surgery for Ewing to correct her fecal incontinence was based on inadmissible hearsay. While *1164 Mrs. Ewing’s testimony was hearsay as to the cost of such surgery, the error in admitting it was harmless because Dr. Sel-linger also testified to the same maximum cost. See State Dep’t of Health & Rehabilitative Servs. v. Whaley, 531 So.2d 723, 730 (Fla. 4th DCA 1988), approved, 574 So.2d 100 (Fla.1991).
On the consolidated appeal, the Ewings challenge the trial court’s final judgment which set off a settlement allocated to the infant child against the entire damage award to Mr. and Mrs. Ewing. The jury’s verdict consisted of an award of $10,000 to the child for economic damages, $40,000 in economic and $170,000 in non-economic damages to Mrs. Ewing, and $30,000 in noneconomic damages to her husband, for a total sum of $240,000. Pri- or to trial, Care Delivery settled their claims with the Ewings for $150,000, and the entire settlement was allocated to the child.
In ordering the set-off, the trial court relied on Dionese. In Dionese, the supreme court considered the following question: “[wjhether a private, unilateral agreement among several plaintiffs to apportion funds paid by one joint tort-feasor is binding upon non-settling joint tort-fea-sors and the court in determining the set-off claim of the non-settling joint tort-feasors?” 500 So.2d at 1347-48. The court concluded that fairness to the parties, particularly the non-settling tortfea-sors, requires the court to ignore a private unilateral apportionment of settlement proceeds among the settling plaintiffs.
Private unilateral agreements by plaintiffs to divvy up the proceeds of a general settlement agreement are contrary to all concepts of fairness. Private unilateral agreements to apportion settlement proceeds would often result in a windfall recovery. In this case, the jury assessed Mr. Dionese’s damages for loss of consortium at $3,800. The settlement allocation the Dioneses advocate— $10,000 to Mrs. Dionese and $35,000 to Mr. Dionese — would result in more than a $30,000 windfall for Mr. Dionese, a recovery about 900% greater than the damages the jury determined he should receive.
Id. at 1350. Thus, the court held that the total amount of the settlement must be set off against the total sum of the verdicts rendered. See id.
The instant case is similar. Care Delivery settled with all of the plaintiffs for $150,000, in an undifferentiated amount. The plaintiffs thereupon agreed that the entire amount would be allocated to the minor plaintiff. However, upon presentation of the evidence, the jury found that the damages to the minor amounted to only $10,000, while the injuries to the mother and the father’s loss of consortium claim exceeded $200,000. Thus, just as in Dionese, to permit the settlement allocation determined by the plaintiffs would result in a recovery to the minor of an amount fifteen times greater than the jury determined he should receive.
However, because this case involves a minor child and requires court approval of any settlement, the Ewings contend that Mendez v. Simon, 739 So.2d 101 (Fla. 3d DCA 1999), controls the outcome of this issue. In Mendez, one tortfeasor settled prior to trial with several plaintiffs for $3 million. Because one plaintiff was a minor, the court held a hearing to allocate the settlement proceeds. After appointment of a guardian ad litem to represent the interests of the minor, the court approved $130,000 of the settlement amount to be allocated to the child. An order was entered to this effect, although the actual release and settlement agreement executed by the parties contained no allocation of the lump sum settlement.
The parties went to trial against the remaining defendants and the jury awarded the minor $452,300, of a total verdict of $2.4 million. The defendant contended that because the settlement agreement for $3 million did not contain an allocation, the entire amount should be set off against the total jury award, resulting in the minor *1165 plaintiff receiving no additional recovery. On the other hand, the minor plaintiff advocated that the defendant was entitled to a set-off only of the $130,000 approved by the trial court. The third district held that because the court had approved the specific allocation of a portion of the settlement proceeds prior to trial, the defendant should be allowed to set off from the amount the jury awarded to the minor only the amount of the settlement allocated to the minor in the court’s order approving the settlement. See id. at 103. The court reasoned that the trial court’s approval of the settlement agreement was required for the settlement of the minor’s claim. See id. at 104. Therefore, in accordance with section 768.041(2), Florida Statutes (1997), and Devlin v. McMannis, 231 So.2d 194 (Fla.1970), the amounts approved by the court were for the minor’s separate claims and items of damages, which the jury determined to be $452,300, or $322,300 greater than the settlement. The court considered the fairness principle enunciated in Dionese and concluded that allowing a set-off of only the allocation provided for in the court’s order of approval met that policy:
[a]t the time of the lower court’s ruling allocating the settlement proceeds to Adaly [three years before trial], there was no certainty of any further recovery or of a trial and jury verdict. Thus, there is no issue here as to an ulterior motive underlying the allocation of the settlement proceeds to Adaly. Furthermore, there is no evidence of collusion here because the trial judge appointed a guardian ad litem, held a hearing at which all parties were entitled to participate and made its own determination regarding what portion of the Dadeland Dodge settlement proceeds should be allocated to Adaly. Thus, our decision today, that a court-ordered apportionment to a minor is valid even if entered into subsequent to the settlement agreement, does not conflict with Dionese.
Mendez, 739 So.2d at 104.
We conclude that the fairness principle and the order of approval of settlement in this case distinguish this case from Mendez. About a week before jury selection began, the plaintiffs filed a motion for the court to approve the settlement but requested that the settlement be confidential and that the defendants be excluded from the hearing approving the settlement. The clerk’s notes in the record reflect that a hearing on the settlement was conducted just prior to voir dire, and the defendants were excluded from the hearing. The order approving the settlement was signed on the date the verdict was rendered, although it is unknown whether it was signed before or after the verdict was returned. In approving the settlement, the order states that the “court finds that it is in the best interest of the parties that the entire settlement funds shall be distributed to the child, Derek Ewing, if reasonable . ...” (Emphasis added). There is no evidence that the trial court made its own independent determination of the proper allocation, as the trial judge did in Mendez. It is also clear that, unlike Mendez, the defendants were excluded from a consideration of the approval of the settlement and could voice no objection.
After the jury verdict in which the baby was awarded only $10,000, the same trial judge determined that Dionese applied and ordered a set-off of the entire $150,-000. Obviously, in light of the evidence presented at trial and the jury’s verdict, the court concluded that it was not reasonable to apportion the entire $150,000 to the child’s case, when the major injuries were to the mother and the husband. To do so would result in a .double recovery and windfall to the plaintiffs. We agree with the trial court’s determination and application of Dionese and affirm its order authorizing set-off.
However, we reverse that portion of the final judgment that enters final judgment against Dr. Anderson only for that portion of the verdict as corresponds *1166 to his percentage of comparative negligence. When the trial court directed a verdict in favor of Dr. Sellinger, who was a joint tortfeasor with Dr. Anderson, it exonerated Dr. Sellinger from liability. Therefore, there were no joint and several tort-feasors to which the principles of section 768.81(3), Florida Statutes (1999) and Fabre v. Marin, 623 So.2d 1182, 1185 (Fla. 1993) would apply. Only Dr. Anderson was determined to be negligent, as the settling tortfeasors listed on the verdict form were not found liable. As the jury found liability on the part of Dr. Anderson, the entire amount of the damages must be awarded against him.[1]
In his post-trial motion Dr. Anderson requested that economic damages be reduced and apportioned in accordance with the principles of Wells v. Tallahassee Memorial Medical Center, Inc., 659 So.2d 249 (Fla.1995), which provides how settlement proceeds should be apportioned between economic and noneconomic damages based upon the jury’s verdict for purposes of calculating the non-settling defendants’ liability. Based upon this motion, the court correctly determined that $29,583.33 of the settlement proceeds should be apportioned as a setoff against the verdict award of $40,000 in economic damages, reducing Dr. Anderson’s liability for economic damages to $10,416.67.
However, in his post trial motion, Anderson did not request a setoff of the settlement proceeds against the noneco-nomic damages. Instead, he requested the application of the Wells principles. Thus, Anderson remains liable for the full amount of the noneconomic damages after the directed verdict in favor of Dr. Selling-er, having failed to preserve the argument he now makes. In the motion for rehearing to our first issued opinion and response thereto, the parties discuss whether Wells has been properly applied under the circumstances of this case. We do not address this question because Anderson never raised it below and in fact relied on Wells.
Affirmed in part; reversed in párt and remanded for further proceedings consistent with this opinion.
KLEIN, J., and OWEN, WILLIAM C., Jr., Senior Judge, concur.

. Anderson as much as conceded this issue by failing to address it at all in his answer brief.