[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11073

_____

ANDREW JOSEPH, JR.,
as natural father, next friend and personal representative
of the Estate of Andrew Joseph, III deceased,

Plaintiff-Appellee,

*versus*

CHAD CHRONISTER,
FLORIDA STATE FAIR AUTHORITY,
an instrumentality of the State of Florida,
MARK CLARK, in his individual capacity,

Defendants-Appellants,

———————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:16-cv-00274-MSS-CPT

———————————————

Before JORDAN, JILL PRYOR, and TJOFLAT, Circuit Judges.

PER CURIAM:

Following oral argument and a review of the record, we affirm the district court's order rejecting the qualified immunity and sovereign immunity claims of the appellants. Because the parties are familiar with the record, we set out only what is necessary to explain our decision, and given the summary judgment posture of the case, we view the facts in the light most favorable to the plaintiff, Andrew Joseph, Jr. ("Mr. Joseph"). *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (qualified immunity under federal law); *Green v. Graham*, 906 F.3d 955, 959 (11th Cir. 2018) (sovereign immunity under state law).

I

The Florida State Fair, organized by the Florida State Fair Authority, takes place every year at fairgrounds located near Tampa. The FSF has a Student Day for which the FSFA issues free admission tickets to students at area schools. Andrew Joseph, III

("Andrew")—who was 14 at the time—attended Student Day at the FSF on February 7, 2014.

After being dropped off with four friends at Gate 3 of the FSF at around 6:30 p.m., Andrew was seized and detained by law enforcement officers employed by the Hillsborough County Sheriff's Office and/or the FSFA. The seizure took place following a disturbance at the FSF's midway. Corporal Mark Clark took Andrew to a processing area in the FSF fairgrounds where all children who had been seized and detained were held.

Corporal Clark then turned Andrew over to Deputy Henry Echenique. At the processing area, Deputy Echenique filled out an ejection form for Andrew based on information provided to him by Corporal Clark. The form stated that the basis for Andrew's ejection was "running through the mid-way causing disorderly conduct." D.E. 255 at 2, ¶ 5. Corporal Clark did not attempt to call Andrew's parents to let them know their son had been detained and was in custody, as required by Fla. Stat. § 985.101(3). Nor did any of the other HCSO officers at the processing area.

Andrew was in custody at the processing area for about 40 minutes, from 8:00 p.m. to about 8:41 p.m. During that time, officers ran a background check on him to ensure that he was not wanted, missing, or endangered. They also took his photograph.

At 8:41 p.m., Deputy Stephen Jones—who at the time was working for the FSFA—and another officer put Andrew and other minors into an HCSO transport van and drove them to a drop-off

4                    Opinion of the Court                    20-11073

point outside Gate 4 of the FSF. The drop-off point was near Orient Road and Interstate 4. The officers did not attempt to release Andrew and the other minors to their parents or other responsible adults, as required by Fla. Stat. § 985.115(2)(a), and told them they would be arrested if they tried to re-enter the FSF fairgrounds.

Andrew did not call his parents while waiting at Gate 4 because he was afraid he would get in trouble. He also declined a ride from a one of his friend's parents. When he and his friend, C.T. (who was 12 years old), asked an officer at Gate 4 if they could re-enter the FSF fairgrounds to walk to their pre-arranged pick-up point, the officer told them they could not and they faced arrest for trespassing.

Andrew and C.T. walked down the sidewalk on Orient Road and under Interstate 4 to the Hard Rock Casino. Andrew and C.T. then ran across Interstate 4 from the Hard Rock Casino towards the FSF. But after Andrew received a phone call, he indicated to C.T. that they needed to turn around. When Andrew and C.T. tried to run back across Interstate 4, Andrew was struck and killed by a car at approximately 10:43 p.m.

Mr. Joseph, Andrew's father, filed a lawsuit against a number of defendants. As relevant here, he asserted a state wrongful death claim against Hillsborough County Sheriff Chad Chronister in his official capacity, a state wrongful death claim against the FSFA on a theory of vicarious liability, a state wrongful death claim against the FSFA on a theory of direct liability, a federal claim under 42 U.S.C. § 1983 against Sheriff Chronister, and federal claims

under § 1983 against Corporal Clark and Deputies Echenique and Jones in their individual capacities.

These defendants moved for summary judgment on the claims against them on the basis of sovereign immunity and qualified immunity, but the district court denied their motions. Sheriff Chronister, Corporal Clark, and the FSFA now appeal.

## II

Our review of the district court's summary judgment order is de novo. *See, e.g., Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1254 (11th Cir. 2004). With that plenary standard in mind, we turn to the arguments of the appellants.

## A

To have Article III standing, a plaintiff must allege and ultimately prove three things: (1) an injury in fact; (2) causation; and (3) redressability. *See Moody v. Holman*, 887 F.3d 1281, 1286 (11th Cir. 2018). In the Article III context, causation means that the plaintiff's injury is "fairly traceable" to the defendant's actions. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Sheriff Chronister and Corporal Clark argue that Mr. Joseph lacks Article III standing because he has not sufficiently proven causation. They assert that the actions of Andrew (and those of other parties) and the time lapse of over two hours (from the seizure to Andrew's death) "create too substantial a break in the 'fairly traceable' chain." Br. for Appellants Chronister and Clark at 55–57.

Our cases hold that, in a qualified immunity appeal under the collateral order doctrine, a defendant cannot raise (and we therefore do not decide) whether the plaintiff has Article III standing. *See Moniz v. City of Fort Lauderdale*, 145 F.3d 1278, 1281 n.3 (11th Cir. 1998); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999); *Scott v. Taylor*, 405 F.3d 1251, 1256 n.8 (11th Cir. 2005). Sheriff Chronister and Corporal Clark do not acknowledge or discuss these cases in their brief, and we see no basis (legal or otherwise) for ignoring them. So, we do not address in this appeal whether Mr. Joseph has Article III standing.

## B

We turn to the merits and begin with Corporal Clark. Mr. Joseph sued Corporal Clark under § 1983, alleging that he violated Andrew's Fourth Amendment rights when he seized and detained him. On appeal, Corporal Clark—who cannot remember the events related to Andrew on the night of February 7, 2014—argues that he is entitled to qualified immunity because he had probable cause, or at least arguable probable cause, to seize and detain Andrew for committing a trespass under Fla. Stat. § 616.185(a) or obstruction of justice under Fla. Stat. § 843.02. According to Corporal Clark, Andrew picked up the hat of one of his friends who had been detained by the officers, ran after the officers, and "interjected himself into [their] escort." Br. for Appellants Chronister and Clark at 7–8, 28–29, 46. Corporal Clark also contends that any Fourth Amendment right that he may have violated was not clearly established. *See id.* at 47–54. Given the record before us, and applying

the governing qualified immunity standard, *see, e.g., District of Columbia v. Wesby*, 138 S. Ct. 577, 589–91 (2018), we disagree with Corporal Clark.

"By now it is well established that '[a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a [§] 1983 claim.'" *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)). Probable cause exists if the facts and circumstances within the officer's knowledge would cause a prudent person to believe, under the circumstances, that the suspect has committed, is committing, or is about to commit an offense. *See id.* at 1318. Arguable probable cause, which provides a basis for qualified immunity, exists where reasonable officers in the same circumstances and possessing the same knowledge could have believed that probable cause existed. *See id.* at 1320.

In assessing the questions of probable cause and qualified immunity, we repeat that we must take the evidence in the light most favorable to Mr. Joseph. *See Tolan*, 572 U.S. at 657. Here the evidence, viewed from that perspective, indicates that Andrew ran after his friend's hat, not the officers. Nor did he interfere with the officers' seizure of his friend or obstruct the officers in the performance of their duties. Instead, he merely picked up the hat belonging to his friend, acknowledged his friendship with him, and attempted to give the hat to him. *See* D.E. 283 at 3, 32–33 (testimony of C.T. and R.P.). The act of picking up a friend's hat and trying to return it, without more, did not give Officer Clark probable cause

or even arguable probable cause to seize and detain Andrew for trespass on the grounds of the FSF under § 616.185(a) (prohibiting the commission of "any act that disrupts the orderly conduct of any authorized activity of the fair association in charge") or for obstruction under § 843.02 (prohibiting the "obstruct[ion]" of a law enforcement officer without violence).

Corporal Clark is wrong in asserting that Andrew ran after the officers and interfered with their detention and escort of his friend. That factual assertion does not view the summary judgment record in the light most favorable to Mr. Joseph. As the district court put it, for summary judgment purposes "Andrew was not, in any conceivable way, committing a crime, or even breaking any rule." D.E. 283 at 36. To the extent that Corporal Clark asserts that he was merely giving Andrew a trespass warning, or that the encounter was a consensual one, those assertions are belied by the lengthy in-custody detention by armed officers in the processing area following Andrew's seizure.

Insofar as the clearly established prong of qualified immunity is concerned, Corporal Clark does not explain how or why a reasonable officer could have believed or thought that picking up a friend's hat and attempting to give it to him was behavior that disrupted the orderly conduct of the FSF, or the FSFA and its employees or agents. We understand, of course, that Corporal Clark does not bear the burden on this point, but the question is whether, under the circumstances, he would have had fair warning that his

seizure and detention of Andrew violated the Fourth Amendment. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).

We agree with the district court that the law was clearly established in February of 2014 that mere proximity to one who is suspected of (or has committed) an offense does not provide probable cause or arguable probable cause for a detention. *See, e.g., Swint v. City of Wadley*, 51 F.3d 988, 997 (11th Cir. 1995) (denying qualified immunity to officers who searched and seized (but did not arrest) patrons at a nightclub when trying to find a single individual who sold drugs to an undercover agent: "Probable cause to arrest one suspect, and even probable cause to believe that a number of other or unidentified people had sold drugs in the establishment in the past, did not give the officers *carte blanche* to seize everyone who happened to be in the Club when the two raids took place."). And, again, Andrew did nothing (when the evidence is viewed in the light most favorable to Mr. Joseph) that would indicate that he had disrupted or obstructed the activities of the officers or of anyone associated with the HCSO, the FSF, or the FSFA. *See Davis v. Williams*, 451 F.3d 759, 766–67 (11th Cir. 2006) (officers did not have probable cause, or arguable probable cause, to arrest homeowner for obstruction of justice or disorderly conduct under Florida law based on his approaching officers conducting a traffic stop near his home and asking them if he could direct the traffic of his guests onto his own property).

## C

Sheriff Chronister and the FSFA contend that they are entitled to sovereign immunity under Florida law on Mr. Joseph's state-law claims for wrongful death.  We disagree.

"[A]n order denying state official or sovereign immunity is immediately appealable if state law defines the immunity at issue to provide immunity from suit rather than just a defense to liability." *Parker v. Am. Traffic Sols., Inc.*, 835 F.3d 1363, 1367 (11th Cir. 2016). Although we had previously read Florida law to mean that sovereign immunity is simply an immunity from liability, *see id.* at 1368–70, the Florida Supreme Court has recently told us that our reading of Florida law has been wrong. Because we now know that "[i]n Florida, sovereign immunity is both an immunity from liability and an immunity from suit," *Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020), we have jurisdiction to address the denial of sovereign immunity to Sheriff Chronister and the FSFA.

## 1

Sheriff Chronister devotes much of his sovereign immunity argument to the contention that he did not owe Andrew any duty under Florida law. *See* Br. for Appellants Chronister and Clark at 21–34. The FSFA also makes the same argument, albeit in a more summary way. *See* Br. for the FSFA at 19–21. The Florida Supreme Court, however, has declared that "duty and sovereign immunity are conceptually distinct," and that the question of sovereign

immunity is addressed only after a court determines that a duty is owed. *See Sanchez v. Miami-Dade Cnty.*, 286 So. 3d 191, 193 (Fla. 2019) ("[I]f a duty of care is owed, it must then be determined whether sovereign immunity bars an action for an alleged breach of that duty."). The Florida Supreme Court has also explained that "[u]nder traditional principles of tort law, the absence of a duty of care between the defendant and the plaintiff results in a *lack of liability, not* application of immunity from suit." *Id.* at 194 (emphasis in original). *See also Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 932 (Fla. 2004) ("If no duty of care is owed with respect to alleged negligent conduct, then there is no governmental liability, and the question of whether the sovereign should be immune from suit need not be reached.").

Because the question of duty goes to the merits of Mr. Joseph's wrongful death claim, and not to the existence of sovereign immunity under Florida law, Sheriff Chronister and the FSFA cannot raise the duty issue in this sovereign immunity appeal. The only proper question for us in an interlocutory appeal raising a state-law sovereign immunity claim is whether the defendant is immune under the relevant state law, and in addressing that question we assume—as the district court concluded—that Sheriff Chronister and the FSFA owed Andrew a duty of care.

**2**

The Florida Supreme Court has held that under Fla. Stat. §§ 768.28(1)–(5), which waives sovereign immunity in certain circumstances, some "'discretionary' government[ ] functions remain

immune from tort liability." *Com. Carrier Corp. v. Indian River Cnty.*, 371 So. 2d 1010, 1022 (Fla. 1979). It has distinguished between "planning" decisions (which are immune) and "operational" decisions (which are not). *See id.* Applying this framework, it held in *Commercial Carrier* that, once a decision had been made to install a traffic light and a traffic sign at an intersection, their maintenance was "operational level activity." *Id.*

The district court ruled that sovereign immunity did not apply to the alleged operational negligence of the officers who implemented the security policies adopted by the FSFA and the HCSO—i.e., the decisions to not call Andrew's parents and to drop Andrew off at Gate 4 at night. *See* D.E. 283 at 25–28. It relied on two Florida Supreme Court sovereign immunity cases: *Kaisner v. Kolb*, 543 So. 2d 732 (Fla. 1989), and *Henderson v. Bowden*, 737 So. 2d 532 (Fla. 1999). As relevant here, *Kaisner* held that sovereign immunity does not apply to how police officers carry out a traffic stop; though the officers' decision "involve[s] a degree of discretion," the decision is "operational, not discretionary." 543 So. 2d at 737–38. *Henderson*, which involved the alleged negligence of officers who after a DUI arrest directed an intoxicated person to drive a car to a nearby location, similarly held that sovereign immunity does not apply to "a situation in which sheriff's deputies are alleged to have acted negligently during a roadside detention." 737 So. 2d at 538.

In his brief, Sheriff Chronister does not address the district court's conclusion that the officers' methods and means of carrying out planning decisions made by the FSFA and the HCSO are

operational in nature. *See* Br. for Appellants Chronister and Clark at 34–40. Without such briefing, we cannot say that the district court erred. First, under Florida law, officers owe a common law duty of care to those they take into custody, and "this duty of exercising reasonable care . . . is an operational level function." *Dep't of Health & Rehab. Servs. v. Whaley*, 574 So. 2d 100, 103 (Fla. 1991). Second, where a district court bases its decision on a given ground, an appellant who fails to address that ground in his brief has effectively abandoned his challenge to the ruling. *See Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 680–81 (11th Cir. 2014). So, we affirm the district court's ruling that Sheriff Chronister is not entitled to sovereign immunity at the summary judgment stage of the case.

For its part, the FSFA argues that sovereign immunity applies because its decision to turn over all security issues to the HCSO, and the policies developed by the HCSO for the FSF, were discretionary planning decisions. And it seeks to distinguish *Kaisner* and *Henderson* on that basis. *See* Br. for the FSFA at 13–20. But the FSFA's focus misses the point. Mr. Joseph is not suing the FSFA for hiring the HCSO to provide security at the FSF. Nor is he suing the FSFA for the general policies created by the HCSO. He is instead suing for the operational negligence of officers on the ground in failing to notify Andrew's parents and in choosing to drop Andrew off at Gate 4 at night. The question is whether that alleged negligence is operational in nature.

Given the record before us, and based on *Commercial Carrier*, *Kaisner*, and *Henderson*, we agree with the district court that the actions of the officers who dealt with Andrew after his seizure are operational. Those actions may have involved some discretion, as was the case in *Henderson*, but that does not change their operational character.

The FSFA alludes generally to the event action plan developed by the HCSO for the FSF but does not quote or summarize any of its provisions. The deposition testimony indicates that the plan is an internal HCSO document, *see* D.E. 243-2 at 185–86, and a copy of the plan can be found at D.E. 236-4. Significantly, the plan does not direct or order officers working at the FSF, as a policy/planning matter, to ignore Fla. Stat. § 985.101(1)(b) and not attempt to call or notify the parents of minors who have been seized and/or detained. Nor does the plan direct or order officers working at the FSF, as a policy/planning matter, to ignore Fla. Stat. § 985.115(2)(a) and not release detained minors into the custody of their parents or other responsible adults. Finally, nor does the plan direct or order officers working at the FSF, as a policy/planning matter, to take detained minors who have been ejected to Gate 4—no matter the time of day—and leave them there to their own devices. Absent such language in the plan devised by the HCSO for the FSF, we cannot say that the alleged negligent acts of the officers are protected by sovereign immunity.

We add one final point. The FSFA contends that the HCSO's actions regarding security were not imputable to it once it made

20-11073                Opinion of the Court                15

the decision to delegate responsibility for security to HCSO. As the district court correctly explained, however, the FSFA's argument is short on legal support:

> The FSFA conspicuously cites no authority for the proposition that a state instrumentality can, as a policy decision, delegate to a third party its obligations and absolve itself from all liability for the operational negligence of its appointed agents—the Court can find none and declines to invent any such precedent in this Order.

D.E. 283 at 25. In its brief here, the FSFA again fails to cite any cases holding that a state agency can delegate its public safety duties to a third-party contractor and thereby enjoy the benefits of sovereign immunity. Even the case cited by the FSFA, *McCall v. Alabama Bruno's, Inc.*, 647 So. 2d 175, 176 (Fla. 1st Dist. Ct. App. 1994) (citing Restatement (Second) Torts § 49 (1965) and its comments), says that there are some "non-delegable duties arising out of some relation toward the public or the particular plaintiff" which cannot be avoided through the hiring of a contractor.

### III

The district court's summary judgment order is affirmed.

**AFFIRMED.**

JORDAN, Circuit Judge, Concurring:

I join the court's opinion in full and write separately to address some of the issues raised by the appellants and not reached by the court.

★ ★ ★ ★ ★ ★ ★

In a qualified immunity appeal under the collateral order doctrine, we do not address claims that the plaintiff lacks Article III standing. *See, e.g., Scott v. Taylor*, 405 F.3d 1251, 1256 n.8 (11th Cir. 2005). But even if we could adjudicate the Article III standing of Mr. Joseph in this appeal, I am not persuaded by argument of Sheriff Chronister and Officer Clark.

At the summary judgment stage, the question is not whether Mr. Joseph has conclusively established Article III causation but rather whether he has submitted sufficient evidence—accepted as true—to create an issue of fact and permit the jury to find that there is causation. *See Bishoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000). Viewing the record in the light most favorable to Mr. Joseph, a reasonable jury could find that Andrew's death is "fairly traceable" to the decisions/actions/omissions of the defendants to (a) not call his parents as required by Florida law; (b) not turn Andrew over to his parents or another adult as required by Florida law; (c) leave Andrew to fend for himself at Gate 4, a drop-off area near Interstate 4, at night; and (d) tell Andrew that he would be arrested if he tried to renter the FSF grounds in order to get back to Gate 3, where he had been dropped off.

2                    [JORDAN, J., Concurring]                    20-11073

To the extent that Sheriff Chronister and Officer Clark are arguing (or suggesting) that proximate cause is missing, any such argument goes not to Article III standing but to the merits of Mr. Joseph's claims for damages. *See Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018). As the Supreme Court has explained, "[p]roximate caus[e] is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).

Indeed, the Supreme Court has rejected an Article III standing argument much like the one that Sheriff Chronister and Officer Clark press here. *See Bennett v. Spears*, 520 U.S. 154, 168–69 (1997) (rejecting defendant's Article III argument that any injury would be the result of another agency's actions: "This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. While . . . it does not suffice if the injury complained of is th[e] result [of] the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else.") (citations and internal quotation marks omitted). We have similarly explained that "a plaintiff need not show that the defendant's actions were the very last step in the chain of causation." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1126 (11th Cir. 2019). Furthermore, "[t]here is no Article III requirement that Mr. [Joseph] 'demonstrate a connection between the injur[y] [he] claim[s] and the . . . rights being

20-11073                 [JORDAN, J., Concurring]                 3

asserted.'" *Moody*, 887 F.3d at 1287 (quoting *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 78 (1978)).

★ ★ ★ ★ ★ ★ ★

I agree with the court that Sheriff Chronister's appeal of the denial of sovereign immunity does not allow us to address whether a duty was owed to Andrew. But because Sheriff Chronister presses the duty issue so forcefully, I explain why I believe his argument is flawed.

In Florida, the "existence of a duty is a legal question." *Limones v. Sch. District of Lee Cnty.*, 161 So. 3d 384, 389 (Fla. 2015). A duty in Florida can arise from (1) statutes or regulations, (2) judicial interpretations of statutes or regulations, (3) sources in the common law or judicial precedent, or (4) the general facts of a case. *See id.* For a number of reasons, I agree with the district court that the Sheriff, through his employees, agents, and subordinates, had a general duty to ensure the safety of minor children like Andrew who have been seized and detained.

First, several Florida statutes create a duty of care where detained minors are concerned. I describe them in detail.

One Florida statute, Fla. Stat. § 985.101(1)(b), provides that a child (i.e., a minor) like Andrew can be taken into custody for a "delinquent act or violation of law." That same statute also provides in a different subsection that when a child is taken into custody for such an act, "the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the

child," and "shall continue such attempt until the parent, guardian, or legal custodian of the child is notified or the child is delivered to the [Department of Juvenile Justice] under [Fla. Stat. §§] 985.14 and 985.145, whichever occurs first." § 985.101(3).

Another Florida statute, Fla. Stat. § 985.115(2), provides that "unless there is a need to hold the child, a person taking a child into custody shall attempt to release the child" to (a) the child's parent, guardian, or legal custodian and if they are unavailable to "any responsible adult;" (b) contingent upon specific appropriation, to an authorized shelter; (c) if the child is suffering from a serious physical condition, to a law enforcement officer who shall take the child to a hospital for evaluation and treatment; (d) if the child is believed to be mentally ill, to a law enforcement officer who shall take the child to a designated facility for evaluation; (e) if the child appears to be intoxicated and has threatened physical harm on himself or others or is incapacitated by substance abuse, to a law enforcement officer who shall take the child to a hospital, addiction facility, or treatment resource; or (f) if available, to a juvenile assessment center equipped and staffed to assume custody of the child for the purpose of assessing his needs.  That same statute further provides in a different subsection that upon taking a child into custody, a law enforcement officer may deliver the child "for temporary custody, not to exceed 6 hours, to a secure booking area of a jail or other facility intended or used for the detention of adults, for the purpose of fingerprinting or photographing the child or awaiting appropriate transport . . . provided no regular sight and sound contact

20-11073                    [JORDAN, J., Concurring]                    5

between the child and adult inmates or trustees is permitted and the receiving facility has adequate staff to supervise and monitor the child's activities at all times." § 985.115(3).

Taken together, these Florida statutes, §§ 985.101(1), (3) and 985.115(2), (3), create a general duty on the part of law enforcement officers to notify the parent, guardian, or legal custodian of a child taken into custody, and to safely release a child who is in custody as directed. The statutes set out detailed and mandatory instructions for what officers are to do (in terms of notification and release) when a child is taken into custody in order to make sure that the child is safe and returned to the adults who care for him. They therefore establish a duty of care. *See* Restatement (Second) of Torts § 286 (1965) (explaining when a statute can be adopted by a court as setting out the standard of care). The situation here is similar to that in *Florida Department of Corrections v. Abril*, 969 So. 2d 201, 205–06 (Fla. 2007), where the Florida Supreme Court held that that state statutes created a duty on the part of laboratories to maintain HIV test results confidential. *See also Estate of Logusak ex rel. Logusak v. City of Togiak*, 185 P.3d 103, 108 (Alaska 2008) (pursuant to statute requiring police to release intoxicated minor to the custody of her parents unless there was a lawful reason for further detention, "police officers did have a duty to act reasonably in releasing [the minor] to her parents").

Sheriff Chronister argues he owed no duty to Andrew because these two statutes only apply to situations where a child is "placed under arrest." But the statutes do not speak of a child who

is "placed under arrest"; they speak of a child who is taken "into custody." *See* §§ 985.101(1), 985.115(2), (3). And taking a person (including a child) "into custody" does not require a formal arrest. As the Florida Supreme Court has held, a person is "in custody" when there is a "formal arrest *or* restraint on freedom of movement of the degree associated with a formal arrest." *Roman v. State*, 475 So. 2d 1228, 1231 (Fla. 1989) (emphasis added and citation and internal quotation marks omitted).

The "in custody" analysis, moreover, focuses on how a reasonable person would have perceived the situation. *See id.* Viewing the facts in the light most favorable to Mr. Joseph, Andrew was in custody from the time that he was taken to the processing area and was still in custody when he was driven to Gate 4 near Interstate 4 and left there. He had been seized against his will inside the FSF fairgrounds, taken in an HCSO van to a processing area, held there for about 40 minutes—during which time the officers ran a background check on him to ensure that he was not wanted, missing, or endangered, and took his photograph—and then driven by officers to Gate 4, where he was left to fend for himself. If that is not custody, I don't know what is.

There is also a common-law basis for concluding that Sheriff Chronister owed Andrew a duty of reasonable care under the circumstances. Under Florida law a "special tort duty does arise when law enforcement officers become directly involved in circumstances which place people within a 'zone of risk' by creating or permitting dangers to exist, by taking persons into police custody,

detaining them, or otherwise subjecting them to danger." *Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 932 (Fla. 2004). Indeed, the Florida Supreme Court has held that a "person taken into custody . . . 'is owed a common law duty of care.'" *Dep't of Health & Rehab. Servs. v. Whaley*, 574 So. 2d 100, 103 (Fla. 1991) (citation omitted). Given these cases, Sheriff Chronister's argument fails.

The existence of a duty of care under these circumstances makes sense. Generally speaking, a "person who has custody of another owes a duty of reasonable care to protect the other from foreseeable harm." Dan B. Dobbs et al., The Law of Torts § 418 (2d ed. June 2021 update). When the police detain a minor, they "owe a duty of reasonable care to protect the minor's safety while he or she is involuntarily detained," and "the majority of courts have held that there is a greater degree of care owed a juvenile." Catherine Palo, *Wrongful Death of a Minor in Police Custody*, 69 Am. Jur. Trials 1 §§ 1, 4 (1998 & August 2021 update).

Importantly, the Florida Supreme Court has rejected the argument that the question of duty should be characterized as narrowly as possible through the specific circumstances presented. *See Limones*, 161 So. 3d at 391 ("reject[ing] the decision of the Second District to narrowly frame the issue as whether [the school district] had a specified duty to diagnose the need for or use an AED on [the student]" in part because such a "narrow definition of duty, a purely legal question, slides too easily into breach, a factual matter for the jury"). So, whether Sheriff Chronister breached that duty of

reasonable care through the operational decisions of his officers (e.g., the decisions to not call Andrew's parents and to drop Andrew off at Gate 4 at night) is a factual issue for the jury to determine, and not a legal one for us to resolve.

★ ★ ★ ★ ★ ★ ★

The district court correctly denied the appellants' motions for summary judgment based on qualified immunity and sovereign immunity. I join the court's opinion.